# United States Court of Appeals
## For the First Circuit

No. 20-1639

N.R., by and through his parents and guardians, S.R. and T.R.,
individually and on behalf of all others similarly situated, and
derivatively on behalf of the Raytheon Health Benefits Plan,

Plaintiff, Appellant,

v.

RAYTHEON COMPANY; RAYTHEON HEALTH BENEFITS PLAN;
WILLIAM M. BULL,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

---

Before

Howard, Chief Judge,
Thompson and Gelpí, Circuit Judges.

---

Eleanor Hamburger, with whom Richard E. Spoonemore, Sirianni
Youtz Spoonemore Hamburger Pllc, Stephen Churchill, and Fair Work
P.C. were on brief, for appellant.

James F. Kavanaugh, Jr., with whom Catherine M. DiVita,
Johanna L. Matloff, and Conn Kavanaugh Rosenthal Peisch & Ford LLP
were on brief, for appellees.

Michael N. Khalil, with whom Kate S. O'Scannlain, Solicitor
of Labor, G. William Scott, Associate Solicitor for Plan Benefits
Security, and Thomas Tso, Counsel for Appellate and Special
Litigation, were on brief, for Eugene Scalia, Secretary of Labor,
amicus curiae.

Martha Jane Perkins, Daniel Unumb, Abigail Coursolle, and Elizabeth Edwards were on brief for National Health Law Program, Autism Legal Resource Center, LLC, Bazelon Center for Mental Health Law, Center for Health Law & Policy Innovation of Harvard Law School, Center for Public Representation, Disability Rights Education and Defense Fund (DREDF), Health Law Advocates, Inc., National Autism Law Center, and The Kennedy Forum, amici curiae.

---

January 31, 2022

---

THOMPSON, Circuit Judge. Plaintiffs S.R. and T.R. are the parents of N.R., who was four years old at the start of our story. The family had health insurance through T.R.'s employment at defendant Raytheon Company. Raytheon enlisted defendant United Healthcare to administer this health insurance plan (simply called the "Plan" from here on out) and assigned defendant William Bull to be the Plan's administrator. Everyone seemed happy with this arrangement until United Healthcare refused to pay for N.R.'s speech therapy. After S.R. and T.R. could not get United Healthcare to change its mind, the family sued for various violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. The district court dismissed the case in full, buying into the defendants' representations of how the Plan works too much for this stage in the litigation. Ever mindful that all well-pleaded factual allegations in the complaint are accepted as true when reviewing a motion to dismiss, we affirm as to Count 1, and reverse and remand as to the remaining counts. See Ezra Charitable Tr. v. Tyco Int'l, Ltd., 466 F.3d 1, 6 (1st Cir. 2006) (in addition to accepting well-pleaded factual allegations in the complaint, we also construe reasonable inferences in favor of the plaintiffs).

**I.**

*Relevant Details of the Plan*

The Plan includes a list entitled "Exclusions," and explains that "[t]he [United Healthcare] plans do not cover any expenses incurred for services, supplies, medical care, or treatment relating to, arising out of or given in connection with [those excluded services.]" Among those excluded expenses are "[h]abilitative services for maintenance/preventive treatment" and "speech therapy for non-restorative purposes."

The "Exclusions" list also includes a nested sub-list of "mental health (including Autism Spectrum Disorder (ASD) services)/substance-related and addictive disorders services [that] are not covered[.]" That "mental health" list includes the following relevant text:

> Habilitative services, which are health care services that help a person keep, learn or improve skills and functioning for daily living, such as non-restorative ABA speech therapy[.]
>
> . . .
>
> Intensive behavioral therapies other than Applied Behavior Analysis (ABA) therapy for Autism Spectrum Disorders (ASD)[.]

*N.R.'s Treatment and Denial of Coverage*

In 2017, a doctor diagnosed N.R. with Autism Spectrum Disorder ("ASD") and prescribed that N.R. "receive speech therapy services." And so, N.R. began treatment with a licensed speech

pathologist, Ann Kulichik, to treat his ASD, "[m]ixed receptive-expressive language disorder, [and] phonological disorder."  Each of those diagnoses was recorded and reported to United Healthcare using its classification number from the International Statistical Classification of Diseases and Related Health Problems, 10th Revision (apparently known as the "ICD-10").  ASD, mixed receptive-expressive language disorder, and phonological disorder are each classified within the "Mental, Behavioral, and Neurodevelopmental" section of the ICD-10.  The ICD-10 also contains a section for "Symptoms, Signs and Abnormal Clinical and Laboratory Findings, Not Elsewhere Classified."  Kulichik noted (in documentation eventually submitted to United Healthcare) that N.R. had several symptoms that fell within this category, namely:  "dysarthria, [] anarthria and dysphagia, oral phase."  Those symptoms are not diagnoses of "either 'mental health' or 'medical/surgical' conditions."

Kulichik submitted N.R.'s claims for speech therapy to United Healthcare using a general code that "is used to describe the delivery of treatment for speech, language, voice, communication and/or auditory processing disorders."  That treatment code (described as "very comprehensive" by the American Speech-Language-Hearing Association), is used when speech therapy is provided to treat a developmental health condition, like ASD, or a medical condition, like a stroke.  Kulichik also submitted at

least one claim for N.R.'s speech therapy using a code "for treatment of swallowing dysfunction and/or oral function for feeding." Like the more general code, this swallowing and feeding code can be used when the speech therapy is to treat a developmental health condition or a medical condition.

United Healthcare denied each of these claims, simply explaining that "this service is not covered for the diagnosis listed on the claim" and referring N.R.'s parents to the "[P]lan documents" for further explanation.

N.R.'s parents appealed these denials through United Healthcare's internal process. The appeal included several letters of medical necessity, including letters from Kulichik and N.R.'s board-certified behavior analyst. N.R.'s parents also argued that the Plan's exclusion of treatment for N.R.'s ASD violated the Mental Health Parity and Addition Equity Act (simply the "Parity Act" after this), an amendment to ERISA aimed at mitigating disparities between mental health and physical health insurance coverage (and the subject of much discussion later).

United Healthcare denied this appeal and offered the following statement from Dr. Samuel Wilmit, a Medical Director at United Healthcare who specialized in pediatrics:

> You are asking for speech therapy. This is for your child. Your child is autistic. Your child does not speak clearly. Your benefit document covers speech therapy if your child lost speech. It is to restore speech that was

- 6 -

> lost. Your child has not had speech that was lost. Therefore, speech therapy is not covered. The appeal is denied.

The denial did not address the argument that these denials violated the Parity Act.

N.R.'s parents filed a second-level appeal, again with documentation about the medical necessity of this treatment and with a more thorough explanation of their Parity Act argument. United Healthcare was unmoved. The denial letter included this statement from Dr. Meenakshi LaCorte, a Medical Director at United Healthcare who specialized in pediatric neonatology:

> I have reviewed the information that was submitted for this appeal. I have also reviewed your benefits. You have requested speech therapy for your child. This therapy is a benefit under your health plan only if your child had speech that was lost. Based on your health plan guidelines, your request is denied.

Again, the denial letter did not mention the Parity Act argument.

After the conclusion of the appeal process, N.R.'s parents requested all documents and internal communications and notes upon which United Healthcare relied when it denied coverage of N.R.'s treatment. The provided documents revealed that United Healthcare did not conduct a "Medical Necessity Review" and never attempted to communicate with any of N.R.'s medical providers, including Kulichik.

Also within those documents were the notes from Dr. Wilmit's review of the first appeal. Dr. Wilmit concluded that N.R.'s "speech or nonverbal communication function" was not "previously intact" and, therefore, the Plan does not cover speech therapy. Dr. Wilmit's notes and United Healthcare's records, generally, did not reflect the source for the conclusion that N.R. had no "previously intact" speech or other communication. In the complaint, the plaintiffs allege that the most reasonable conclusion is that Dr. Wilmit assumed that N.R. had no previously intact speech (and therefore treatment was not covered) because of his ASD diagnosis and not based on any actual documentation of N.R.'s condition.

The internal notes from the second-level appeal include the following summary:

> This request is for speech therapy for a [four-year-old] boy. This child has autism and a speech disorder. There is no documentation that speech therapy is needed for restoration of speech. The speech therapy is not a covered benefit and the request is denied.

Nothing in the internal documents discussed N.R.'s parents' Parity Act argument.

After the last denial of their appeal, N.R.'s parents contacted Raytheon and United Healthcare and requested the list of "non-mental health conditions to which the Plan applies the 'non-restorative' speech therapy exclusion," "the medical necessity

criteria" for applying the non-restorative speech therapy exclusion to medical or mental health benefits, and the "processes, strategies, evidentiary standards, and other factors" used to apply the exclusion. N.R.'s parents received no response.

*Resultant Litigation*

ERISA authorizes a plan participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan," "to enjoin any act or practice which violates [ERISA]," for "relief" for failure to provide information requested by the beneficiary, and "to obtain other appropriate equitable relief." 29 U.S.C. § 1132(a)(1)-(3). Relying on each of these provisions, N.R. and his parents sued Raytheon, United Healthcare, and Bull, in his role as the Plan administrator, seeking damages and declaratory and injunctive relief. At the core of N.R.'s case was his argument that the Plan's exclusion of non-restorative speech therapy for ASD violates the requirements of the Parity Act.

The defendants collectively moved to dismiss. Of note to our analysis, in their supporting memorandum, the defendants told the district court that the Plan complied with the Parity Act's requirements because the non-restorative exclusion applies to all types of conditions, no matter whether the beneficiary is prescribed treatment for a medical or a mental health/substance

- 9 -

use diagnosis.[1]  The district court agreed that the defendants' explanation of the Plan's application was the only possible reading and so the Plan did not violate the Parity Act.  For that and additional reasons specific to some of the claims, the district court allowed the defendants' motion and dismissed the case, including dismissing some of the claims with prejudice.  N.R. timely appealed and here we are.[2]

---

[1] The defendants explained the hypothetical operation of the Plan in the following way:

> A person might not develop a "normal" level of speech due to a medical/surgical condition as well as a mental health condition. For example, a person might have difficulty speaking due to a lisp, stutter, deafness, or physical deformity of the mouth or vocal [cords] from birth. Under these circumstances, there would be no loss of speech that was "previously intact." If the person sought speech therapy, and the purpose of the therapy was to help the person achieve a level of speech beyond what had previously been achieved, coverage for that treatment would be barred under the Exclusion. Coverage would be barred, not because treatment was sought for a certain type of condition, but because it was "nonrestorative."

[2] N.R. also brought this suit on behalf of a purported class of participants or beneficiaries of the Plan who have received or are expected to require services for a mental health condition that are excluded from coverage by the Plan's habilitative services exclusion.  The district court's order did not address the class allegations and there is no discussion of those allegations on appeal.

We review the district court's decision to dismiss N.R.'s case for failure to state a claim de novo. Ezra Charitable Tr., 466 F.3d at 6. In doing so, we assume all well-pleaded facts to be true, analyze those facts in the kindest light to the plaintiff's case, and draw all reasonable inferences in favor of the plaintiff. U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011). A successful complaint must plead "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008). "We may augment these facts and inferences with data points gleaned from documents incorporated by reference into the complaint." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011).

N.R. brought four different claims, but one question predominates the analysis: Does the Plan violate the Parity Act? We conclude that it may, which is all N.R. needs at this stage of the game, and so we begin by explaining our thinking on that point and then move to what that means for each individual count of the complaint.

*Does the Plan Violate the Parity Act?*

ERISA establishes the bare minimum standards to which private health care plans must adhere. The Parity Act amended

- 11 -

ERISA to require that, if a health insurance plan provides "both medical and surgical benefits and mental health or substance use disorder benefits," the plan must not impose more coverage restrictions on the mental health or substance use disorder benefits. 29 U.S.C. § 1185a(a)(3)(A)(i). Any treatment limitations applied to mental health or substance use disorder benefits must be "no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan." 29 U.S.C. § 1185a(a)(3)(A)(ii).

A violation of the Parity Act generally manifests through a health insurance plan (1) applying treatment limits that are more restrictive than "the predominant treatment limitations applied to substantially all medical and surgical benefits" or (2) applying "separate treatment limitations" only to mental health or substance use disorder benefits. 29 U.S.C. § 1185a(a)(3)(A)(ii). As the name of the Act suggests, health plans must have parity between mental health and medical benefits within the same "classification," which refers to (1) inpatient, in network services; (2) inpatient, out of network services; (3) outpatient, in network services; (4) outpatient, out of network services; (5) emergency care; and (6) prescription drugs. 29 C.F.R. § 2590.712(c)(1)(i), (c)(2)(ii). The Parity Act also measures parity between mental health and medical benefits in a qualitative

manner, including mandating equivalence in "medical management standards limiting or excluding benefits based on medical necessity or medical appropriateness" and "restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for services provided under the plan or coverage." 29 C.F.R. § 2590.712(c)(4)(ii)(A), (H). However, "disparate results alone do not mean that [nonquantitative treatment limitations] in use do not comply [with the Parity Act.]" Preamble, Final Rules, 78 Fed. Reg. at 68245-46. N.R. argues that, on its face, the terms of the plan apply "separate treatment limitations," 29 U.S.C. § 1185a(a)(3)(A)(ii), to mental health benefits because the Habilitative Services Exclusion applies only to "mental health service[s]."

The defendants note that a "habilitative services" exclusion shows up twice in the larger list of "Exclusions," once generally in the main body of the list and once in a sub-list of "mental health" exclusions. As they see it, no habilitative service is covered, no matter what ailment the service is intended to treat, so medical and mental health benefits are the same and the Parity Act's requirements are satisfied. However, N.R. points out, the Plan itself only defines habilitative services once, in the "mental health" sub-list, as a type of "mental health service."

- 13 -

So, per the Plan's own text, that exclusion can only apply to mental health services.

N.R.'s argument is bolstered when we consider the Plan covers at least some procedures (emphases our own) "when a physical impairment exists and the primary purpose of the procedure is to improve or restore physiologic function for an organ or body part." Lest we be unsure what the Plan means by "improve," it provides a clear definition: "Improving or restoring function means that the organ or body part is made to work better." Put that together and the Plan explicitly covers services that "[i]mprov[e] function" for those with "a physical impairment." Yet, the Habilitative Services Exclusion instructs us that the Plan does not cover treatments that "improve skills and functioning" if the beneficiary is seeking "mental health" services. This is precisely the distinction the Parity Act prohibits. See 29 U.S.C. § 1185a(a)(3)(A)(ii).

No matter what we think of the text of the Plan though, N.R. tells us, the way the habilitative services exclusion is applied to plan beneficiaries violates the Parity Act. N.R. directs us to the text of the defendants' denials of coverage for his speech therapy. Each time the defendants denied coverage, they told N.R. that "this service is not covered for the diagnosis listed on the claim," and that diagnosis was always ASD. N.R. alleges that the defendants never actually confirmed whether

N.R.'s speech therapy was non-restorative, but simply denied coverage because of his ASD diagnosis. Indeed, United Healthcare's report of its review process, appended to the complaint, indicates that its staff did not undertake a "medical necessity review" or contact any of N.R.'s medical providers to confirm that all speech therapy would be habilitative.

Plus, N.R. alleges that the Plan covers non-restorative treatment for physical conditions that are present at birth, "such as reconstructive procedures, congenital heart disease or congenital malformations related to infertility, among others." The defendants, for their part, insist (without any citation to the text of the Plan) that is not true and that the Plan would not cover speech therapy for a beneficiary with "difficulty speaking due to a lisp, stutter, deafness, cleft palate, or physical deformity of the mouth or vocal [cords] from birth."

This may be a tough disagreement to untangle, with each side making arguments about the reading of the complex Plan document and the actual application of the habilitative services exclusion, but, thankfully, this case is before us on an appeal from a motion to dismiss. We do not review a motion to dismiss by granting any favor to the defendants' version of the facts. Instead, "we accept the truth of all well-pleaded facts and draw all reasonable inferences therefrom in the pleader's favor." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44 (2012). The Parity

Act forbids "applying 'separate treatment limitations' only to mental health or substance use disorder benefits." 29 U.S.C. § 1185a(a)(3)(A)(ii). N.R. pleads that the Plan defines habilitative services as mental health services and accordingly only applies the habilitative services exclusion to the treatment of mental health ailments. That is an entirely plausible reading of the text of the Plan, which N.R. appended to the complaint for judicial review, and could make for a successful Parity Act claim. See T.S. by and through T.M.S. v. Heart of CarDon, LLC, No. 1:20-cv-01699-TWP-TAB, WL 981337, at *3-4 (S.D. Ind. March 16, 2021) (cautioning that, once a plan explicitly covered a treatment for ASD, "it could not use blanket exclusion 'to deny coverage of ABA therapy' because that prohibition represented 'a separate treatment limitation that applie[d] only to mental treatment.'" (quoting A.F. ex rel. Legaard v. Providence Health Plan, 35 F. Supp. 3d 1298, 1315 (D. Or. 2014) (holding that a plan covering ASD, but excluding coverage for developmental disabilities, violated the Parity Act))); see also Grajales, 682 F.3d at 44 ("In order '[t]o survive a motion to dismiss for failure to state a claim, the complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face." (quoting Katz v. Pershing, LLC, 672 F.3d 64, 72-73 (1st Cir. 2012) (alterations adopted))). The defendants' promise that the Plan does not function as N.R. alleges, and, instead, is in compliance

- 16 -

with the Parity Act, does not change our analysis of a motion to dismiss. See, e.g., Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 13 (1st Cir. 2011) ("The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint.").

The same goes for N.R.'s allegations that the defendants denied coverage of his speech therapy as soon as they saw his ASD diagnosis and that, if his diagnosis were of a purely physical malady, the result would have been different. Those claims, well-articulated, are all N.R. needs to do to get to discovery, where he can then find out whether he's actually right. See id. at 7.

The district court agreed with the defendants' representation of how the Plan works. At this stage of the process such determination was premature. See Cebollero-Bertran v. P.R. Aqueduct and Sewer Auth., 4 F.4th 63, 73 (1st Cir. 2021) ("This inference, drawn in the defendant's favor, not the plaintiff's, was improper on a motion to dismiss.").

N.R.'s Parity Act argument informs all of his claims, but the district court held that Count 3 of the complaint, a claim for equitable relief per 29 U.S.C. § 1132(a)(3), was the only proper procedural vehicle through which N.R. could adjudicate his case, and so dismissed this claim on the merits. Having concluded that N.R. sufficiently pled that the Plan violates the Parity Act

- 17 -

in its text or in its application, we reverse the district court's dismissal of Count 3.[3]  We now turn to the remaining ERISA provisions under which N.R. brings his case.

*Breach of Fiduciary Duty*

N.R. brings a breach of fiduciary duty claim (Count 1) under 29 U.S.C. § 1132(a)(2), arguing that he is entitled to relief for the Parity Act violation claim under this statute.  Given the specific pleadings and circumstances here, we disagree.  We will explain why, but first a few background principles that helped us get there.

ERISA requires plan fiduciaries to discharge their duties "in the interest of the participants and beneficiaries" and "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [Subchapters I and III of ERISA]."  29 U.S.C. § 1104(a)(1).  Fiduciaries are charged with many tasks, including making "benefit determination[s]" in compliance with the terms of the statute and the plan.  Aetna Health Inc. v. Davila, 542 U.S. 200, 219 (2004) ("[A] benefit determination is part and parcel of the ordinary fiduciary responsibilities connected to the administration of a plan."); accord Varity Corp. v. Howe, 516 U.S. 489, 511 (1996) (citing 29 U.S.C. § 1104(a)(1)(D)) ("[A] plan

---

[3] On appeal, the defendants agree that § 1132(a)(3) is the avenue to pursue a Parity Act claim.

administrator engages in a fiduciary act when making a discretionary determination about whether a claimant is entitled to benefits under the terms of the plan documents."); see Pegram v. Herdrich, 530 U.S. 211, 231 (2000) ("At common law, fiduciary duties characteristically attach to decisions about managing assets and distributing property to beneficiaries."). If a fiduciary breaches its duty, ERISA empowers participants and beneficiaries to bring a civil suit for that breach, per 29 U.S.C. § 1132(a)(2), and to seek financial remedies and "such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary," 29 U.S.C. § 1109.

Understanding that, N.R. alleges that Raytheon and Bull each breached their fiduciary duties when they denied coverage for N.R.'s speech therapy, in violation of the Parity Act.[4] The district court dismissed this claim with prejudice, reasoning that the only proper claim for a breach of fiduciary duty is one in which a plan was financially harmed by the fiduciary's action, and the Plan suffered no financial losses from declining to pay for N.R.'s speech therapy. Given the pleadings here, we agree with the district court.

---

[4] There appears to be no dispute that Raytheon and Bull are fiduciaries, which are simply those with authority over and discretion about the administration of the plan. 29 U.S.C. § 1002(21).

While we have determined that Raytheon and Bull are fiduciaries, that benefit determinations are fiduciary acts, and that benefit determinations must be consistent with ERISA, we read § 1132(a)(2) as concerned solely with plan asset mismanagement and solely authorizing remedies that inure to the benefit of the plan as a whole. See LaRue v. DeWolff, Boberg & Assocs., Inc., 473 U.S. 134, 141-43 (1985); see also Varity Corp., 516 U.S. at 511-12. Since the Parity Act violation claim does not allege plan asset mismanagement and does not seek a remedy that would inure to the benefit of the Plan as a whole, N.R. cannot package the claim as one for breach of fiduciary duty under § 1132(a)(2).

Section 1132(a)(2) empowers a beneficiary to bring a civil action "for appropriate relief under section 1109 of this title." Section 1109(a) states in pertinent part:

> Any . . . fiduciary . . . who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).

According to the Supreme Court, § 1132(a)(2) "does not provide a remedy for individual injuries distinct from plan

injuries." LaRue, 552 U.S. at 256; see also Graden v. Conexant Sys. Inc., 496 F.3d 291, 295 (3d Cir. 2007) ("[S]uits under [§ 1132(a)(2)] are derivative in nature;" though beneficiaries may bring suit under the provision, "they do so on behalf of the plan itself."). Moreover, the Supreme Court has characterized 29 U.S.C. § 1109(a) as "primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan," Russell, 473 U.S. at 142; and has held that § 1109's "entire text . . . persuades us that Congress did not intend that section to authorize any relief except for the plan itself," id. at 144. Interpreting § 1109, the Supreme Court specifically rejected a broader reading based upon the provision's mention of other appropriate equitable relief. See id. at 141-42 ("To read directly from the opening clause of § [1109](a), which identifies the proscribed acts, to the 'catchall' remedy phrase at the end -- skipping over the intervening language establishing remedies benefiting, in the first instance, solely the plan -- would divorce the phrase being construed from its context and construct an entirely new class of relief available to entities other than the plan.").

In line with this Supreme Court precedent, other circuits have affirmed dismissal of claims for breach of fiduciary duty brought under § 1132(a)(2) that do not allege damage to a plan's financial integrity and do not seek a remedy that will inure

- 21 -

to the plan as a whole. See Smith v. Med. Benefit Adm'rs Grp., Inc., 639 F.3d 277, 283 (7th Cir. 2011) (observing "Russell . . . controls here, and as Smith has identified no injury to the plan, he has no viable claim for relief under section [1132](a)(2)" and affirming dismissal of claim brought under § 1132(a)(2) alleging that claims administrator had misleading practice of pre-authorizing treatment and subsequently refusing to cover it); Wise v. Verizon Commc'ns Inc., 600 F.3d 1180, 1189 (9th Cir. 2010) (affirming dismissal of claim brought under § 1132(a)(2) for plan administrator's mishandling of plaintiff's individual benefits claim where plaintiff did not allege "plan-wide injury"); Lee v. Burkhart, 991 F.2d 1004, 1009 (2d Cir. 1993) (explaining "Russell . . . bars plaintiffs from suing under [§ 1132(a)(2)] because plaintiffs are seeking damages on their own behalf, not on behalf of the Plan" and affirming dismissal of claim brought under § 1132(a)(2) seeking benefits owed but unpaid by plan's sponsor due to its bankruptcy).

Our decision in Evans v. Akers, 534 F.3d 65 (1st Cir. 2008), says no different. Indeed, Evans supports a reading of § 1132(a)(2) as concerned with plan asset management. See 534 F.3d at 68-73. The alleged breach of fiduciary duty in Evans was imprudent investment of participants' contributions to a defined contribution retirement plan, and the plaintiffs sought to hold the fiduciaries personally liable for this asset mismanagement.

- 22 -

Id. at 68. By holding the fiduciaries personally liable under § 1132(a)(2), the value of the plaintiffs' individual accounts could be restored to what it would have been but for the imprudent investment. Id. at 73.[5]

Here, N.R.'s claim under Count 1 does not allege plan asset mismanagement and does not seek a remedy that will inure to the Plan as a whole. The only relief that N.R.'s complaint seeks in connection with Count 1 is for "Defendants to restore all losses arising from the breaches of fiduciary duties that occurred when treatment was denied that is required by the terms of the Plan." And the only losses alleged are benefits which were not paid out to N.R. and putative class members. N.R. does not allege any losses to the Plan itself. See K.H.B. ex rel. Kristopher D.B. v. UnitedHealthcare Ins. Co., No. 18-cv-000795, 2019 WL 4736801, at *3 (D. Utah Sept. 27, 2019) (unpublished) ("Although the denial of coverage . . . is alleged to be systematic . . . the alleged injury is class-wide, not plan-wide. . . . [I]n the absence of sufficient factual allegations suggesting the Plan suffered monetary losses, this fails to adequately plead relief on behalf of the Plan.");

_____

[5] The plaintiffs in Evans, unlike the plaintiffs here, could not have brought suit under § 1132(a)(1)(B) (which allows for recovery of benefits from "the Plan itself") because taking money from a defined contribution plan is a zero-sum game: in order to restore the benefits owed to the plaintiffs, other participants would be robbed because all of the money in a defined contribution plan is allocable to participants' individual accounts. 534 F.3d at 72-73.

id. (affirming dismissal of claim brought under § 1132(a)(2) alleging denial of coverage for mental health treatment in violation of the Parity Act). Given the facts presented here, we affirm the district court's dismissal of Count 1, leaving N.R. to pursue his Parity Act violation claim through different avenues. See Varity Corp., 516 U.S. at 512 ("ERISA specifically provides a remedy for breaches of fiduciary duty with respect to the interpretation of plan documents and the payment of claims, one that is outside the framework of [§ 1132(a)(2)] . . . and one that runs directly to the injured beneficiary. § [1132](a)(1)(B)." (emphasis added)).

*Recovery of Benefits*

Moving on. N.R., as a plan beneficiary, can sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). N.R.'s claim for speech therapy benefits breaks down into two steps: (1) the Parity Act's requirements are incorporated as "the terms of the plan" and (2) the Plan's Habilitative Services Exclusion violates the Parity Act, so it is inconsistent with a "term of the plan." The district court dismissed this claim with prejudice because it concluded that the Parity Act's requirement is not a "term of the plan" and that N.R.

was correctly denied benefits per the Habilitative Services Exclusion. The defendants make the same argument on appeal.

As we've said before, a plan's terms cannot override ERISA's requirements. 29 U.S.C. § 1104(a)(1)(D) (requiring fiduciaries to discharge duties consistent with plan documents "insofar as such documents and instruments are consistent with the provisions of [ERISA]"); e.g., In re Citigroup ERISA Lit., 662 F.3d 128, 139 (2d Cir. 2011) (holding that ERISA's requirements supersede a plan's terms when inconsistent with one another). We have already concluded that N.R. plausibly pled that the Habilitative Services Exclusion violates the Parity Act. Considering these concepts together, we see that N.R. properly pleads that the Habilitative Services Exclusion is trumped by ERISA and is accordingly unenforceable. Therefore, without the Exclusion in force, N.R. has a perfectly reasonable argument that he's owed "benefits due to him under the terms of his plan." See 29 U.S.C. § 1132(a)(1)(B). We reverse the district court's dismissal of this claim.

*Request for Information*

Last up is N.R.'s claim under 29 U.S.C. § 1132(a)(1)(A), that Bull, as the plan administrator, violated ERISA's disclosure requirements when he did not answer N.R.'s parents' request for

information.[6] After a bit of a statutory scavenger hunt to line up the details of this claim, we see that § 1132(a)(1)(A) authorizes a plan participant or beneficiary to bring a civil action against a plan administrator who violates § 1132(c)(1)(B), which provides for damages for an administrator who (circularly) "fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary." Two provisions of the subchapter in question require an administrator to furnish the following information upon request: "a copy of the latest updated summary plan description . . . or other instruments under which the plan is established or operated" and "criteria for medical necessity determinations made under the plan with respect to mental health [and t]he reason for any denial under the plan . . . with respect to mental health or substance use disorder benefits." 29 U.S.C. §§ 1024(b)(4), 1185a(a)(4).

As a reminder, after the unsuccessful conclusion of the internal appeals process, the complaint alleges, N.R.'s parents contacted United Healthcare and Raytheon (through its in-house counsel and its litigation counsel for this case) and requested,

_____

[6] There is no dispute that Bull is the Plan Administrator as discussed in the statute and defined by the applicable regulations. See 29 U.S.C. § 1002(16)(A)(i) (defining "administrator" in several ways, including as "the person specifically so designated by the terms of the instrument under which the plan is operated"). Plus, the complaint identifies Bull as the Plan Administrator.

essentially, all information about how the Plan applies the non-restorative speech therapy exclusion.[7]  The district court noted that the plaintiffs attached to the complaint a copy of a request letter that was sent to United Healthcare, but did not include such a letter that was sent to Raytheon.  The district court apparently concluded that the complaint, therefore, only sufficiently alleged that N.R.'s parents sent a letter to United Healthcare.  All agree that United Healthcare is the <u>claims</u> administrator, not the <u>plan</u> administrator, and therefore, the district court dismissed this claim, reasoning that N.R.'s parents never contacted the plan administrator, as required by statute. <u>See</u> 29 U.S.C. § 1132(c)(1)(B).

On that specific point, the district court was correct. A claims administrator is distinct from a plan administrator and merely requesting information from a claims administrator does not trigger § 1132(c)'s disclosure requirements.  <u>Tetreault</u> v. <u>Reliance Std. Life Ins. Co.</u>, 769 F.3d 49, 59-60 (1st Cir. 2014). Beyond that, to the extent Raytheon urges us to affirm dismissal because the plaintiffs do not allege that they addressed a letter

---

[7] More precisely, N.R.'s parents requested the list of "non-mental health conditions to which the Plan applies the 'non-restorative' speech therapy exclusion," "the medical necessity criteria" for applying the non-restorative speech therapy exclusion to medical or mental health benefits, and the "processes, strategies, evidentiary standards, and other factors" used to apply the exclusion.

personally to Bull, we have never endorsed quite such a persnickety reading of the statute. See Law v. Ernst & Young, 956 F.2d 364, 373 (1st Cir. 1992) (recognizing that Congress desired employees to have "timely information about their ERISA benefits" and holding that "[i]f to all appearances, [a company] acted as the plan administrator . . . it may be properly treated as such"). The plaintiffs alleged that N.R.'s parents attempted to acquire the information that § 1132(c) requires plan administrators to disclose by contacting Raytheon (Bull's employer), its in-house counsel, and its outside counsel, who is also representing Bull in this case. At the motion to dismiss stage, we presume that to be true.

The better argument for dismissal, so we're told, is that the defendants have already provided plaintiffs with all required information and that anything left that could be responsive to plaintiffs' request does not have to be disclosed, per the statute. First, the argument that the defendants handed over everything ERISA requires presumes that to be true, when the appropriate standard is to credit the plaintiffs' allegations that they are entitled to more, yet to be disclosed, documents. See Cebollero-Bertran, 4 F.4th at 73.

Second, the defendants argue that the plaintiffs have no right to the documents they claim to seek. In support of this, the defendants rely heavily on Doe v. Travelers Ins. Co., 167 F.3d

53 (1st Cir. 1999). There, a plan beneficiary claimed a violation of ERISA's disclosure requirements because the plan administrator did not, upon request, tender a copy of the plan's "mental health guidelines." Id. at 59. We held that the "mental health guidelines" in that case did not qualify as one of the plan's "instruments" that the administrator must disclose. Id. We reached this conclusion, in part, because the "mental health guidelines" were an optional screening tool that the plan administrator used at its discretion, so the administrator may well have disregarded those guidelines when deciding the beneficiary's claim. Id. at 59-60.

Though the defendants sound alarms to the contrary, nothing in Doe is inconsistent with our holding today. Importantly, Doe interpreted ERISA requirements prior to the enactment of the current version of the Parity Act, which added substantive requirements for how plans engaged with mental health and substance use disorder benefits. See 29 U.S.C. § 1185a(a)(4). Plus, the optional "guidelines" at issue in Doe are unlike the mandatory plan terms that governed the decision in N.R.'s case. ERISA leaves no doubt that Congress intended plan participants and beneficiaries to know about mandatory terms of their plans. See Law, 956 F.2d at 373.

Considering all of this from the proper perspective for reviewing a motion to dismiss, we conclude the plaintiffs properly

pled a claim under 29 U.S.C. § 1132(a)(1)(A) and reverse the district court's dismissal of that count.

### III.

For all of the reasons just discussed, we **affirm** the district court's grant of the defendants' motion to dismiss on Count 1, and we **reverse** and **remand** for further proceedings on Counts 2 through 4.  Costs to the plaintiffs.