# United States Court of Appeals
## For the First Circuit

No. 21-1651

RENEE MINISTERI, Personal Representative of the Estate of
Anthony Ministeri,

Plaintiff, Appellee,

v.

RELIANCE STANDARD LIFE INSURANCE COMPANY,

Defendant, Appellant.

No. 21-1652

RENEE MINISTERI, Personal Representative of the Estate of
Anthony Ministeri,

Plaintiff, Appellant,

v.

RELIANCE STANDARD LIFE INSURANCE COMPANY,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Barron, Chief Judge,
Selya and Howard, Circuit Judges.

Joshua Bachrach, with whom Kara Thorvaldsen and Wilson, Elser, Moskowitz, Edelman & Dicker LLP were on brief, for defendant.

Teresa A. Monroe, with whom Monroe Law LLP, Eugene F. Sullivan, Jr., Richard J. Sullivan, and Sullivan & Sullivan, LLP were on brief, for plaintiff.

July 25, 2022

**SELYA**, **Circuit Judge**. It is common ground that ambiguities in an insurance policy — particularly ambiguities in an insurance policy issued as part of an employee benefit plan and, thus, within the protective carapace of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461 — must ordinarily be construed against the issuing insurer. The case at hand is a poster child for this familiar proposition.

The backdrop is easily painted. In these consolidated appeals, we are tasked — among other things — with deciding whether an employee lost life insurance coverage under his employer's group policy after he developed a brain tumor that disrupted his usual work. The insurance company denied coverage on the ground that the employee had lost coverage before his death. We conclude that the policy language invoked by the insurance company is less than clear, bringing into play the rule that ambiguous terms in an insurance policy should be read, within reason, in favor of coverage. Applying that rule, we hold that the employee was covered at the time of his demise.

The court below granted a motion for summary judgment filed by the employee's widow as to both the basic life insurance amount of $624,000 and the supplemental life insurance amount of $468,000. See Ministeri v. Reliance Standard Life Ins. Co., 523 F. Supp. 3d 157, 181 (D. Mass. 2021). The court also awarded her attorneys' fees, costs, and prejudgment interest. The insurer has

appealed, and the widow has cross-appealed to challenge the rate set by the district court for prejudgment interest. Discerning neither any reversible error nor any abuse of discretion, we reject both appeals and leave the parties where we found them.

**I**

We briefly rehearse the relevant facts and travel of the case. On April 1, 2014, Anthony Ministeri (Ministeri) began working at AECOM Technology Corporation (AECOM) in Chelmsford, Massachusetts, as a construction services executive. He was to work twenty-four hours per week for an annual salary of $156,000. His ordinary duties required frequent travel.

Through AECOM's group plan, Ministeri selected life insurance coverage underwritten by Reliance Standard Life Insurance Company (Reliance). He opted for coverage in the amount of $624,000 (four times his salary) in basic life insurance and $468,000 (three times his salary) in supplemental life insurance.

On May 2 — barely a month after beginning his new job — Ministeri became discombobulated (to the point of getting lost in an office building, struggling to drink from cups, and typing gibberish) while on a business trip in New York City. Upon his return to Massachusetts, an MRI revealed a brain lesion. After two brain biopsies, Ministeri was diagnosed with glioblastoma (an especially aggressive type of brain tumor). He was treated with radiation and chemotherapy through July.

Ministeri retained his job at AECOM and did at least some work from home during the period from May until early August 2014 (although the parties wrangle over how much work he did and when he did it). He continued to receive his customary salary and submitted timesheets claiming his normal twenty-four hours of work each week (always Monday, Tuesday, Wednesday), and AECOM invariably approved those timesheets.

On July 31, Ministeri met with Dr. Elizabeth Collins for an outpatient consultation. Ministeri's measured optimism (at least for the short term) is reflected in Dr. Collins's note of that meeting. He said that he felt "much better" and that he was "completely comfortable walking independently." Moreover, he "explained that he would like to return back to work," including significant air travel. He acknowledged, however, that his brain tumor would eventually "come back" and estimated that he was at eighty percent of his prior functioning, noting that he felt "a little bit slow in the uptake in his brain."

On August 10, Ministeri suffered a massive pulmonary embolism. He received extensive hospital care and eventually was transferred to a rehabilitation facility. Unable to work at all, Ministeri took a formal leave effective August 8, 2014. He applied for and received long-term disability benefits under a separate policy issued by Reliance (also a part of AECOM's benefits package). For purposes of that policy, Reliance determined that

Ministeri's last day of work at AECOM was August 6. Ministeri continued to pay his premiums on his life insurance policy until his death the following year.

During the fall and early winter of 2014, Ministeri's condition showed signs of improvement. A series of neuro-oncology clinic notes signed by Dr. Erik Uhlmann — after monthly meetings with Ministeri from September through January — recount that Ministeri's "[m]ental status [wa]s satisfactory in areas of alertness, orientation, concentration[,] memory and language"; that he had "[n]o trouble walking, good balance," and "no fatigue"; and that he had "[n]o visual problems, no weakness," and "no difficulty . . . speaking." On September 19, 2014, Dr. Uhlmann wrote that Ministeri was "presently not fit to return to work" but would be "able to return to work" on January 5, 2015. In January, though, Dr. Uhlmann pushed back the projected date of Ministeri's return to work to March 31, 2015. Despite Dr. Uhlmann's optimism, Ministeri was never able to resume work and succumbed to his illness on October 2, 2015.

On March 24, 2016, Ministeri's widow, plaintiff Renee Ministeri, submitted a proof-of-loss statement to Reliance, through AECOM. In it, she claimed a total of $1,092,000 under her late husband's life insurance policy. On July 8, 2016, Reliance denied the claim. In a letter to the plaintiff, it stated that Ministeri lost eligibility under the policy once he stopped working

"Part-time," which the policy defined as "working for [AECOM] for a minimum of 20 hours during [his] regularly scheduled work week." Reliance explained that, following Ministeri's disorientation in New York in May of 2014, he was no longer performing his usual duties (especially travel) for a minimum of twenty hours per week and, thus, his coverage under the policy had lapsed. The plaintiff appealed this denial, but Reliance held firm.

In March of 2018, the plaintiff sued Reliance in the United States District Court for the District of Massachusetts alleging wrongful denial of benefits under section 502(a) of ERISA, 29 U.S.C. § 1132(a)(1)(B), (a)(3).[1] Reliance answered the complaint, and the plaintiff's request to expand the administrative record through discovery was denied. Ministeri, 523 F. Supp. 3d at 165. In due course, the parties cross-moved for summary judgment on the administrative record. After briefing and oral argument, the district court granted the plaintiff's motion for summary judgment, denied Reliance's cross-motion, and awarded the plaintiff the sum of $1,092,000. See id. at 161-62. In a subsequent order, the court awarded the plaintiff attorneys' fees ($102,018.75), costs ($426.83), and prejudgment interest (to be computed at a rate of 7.5%). See Ministeri v. Reliance Standard

---

[1] The complaint also named AECOM as a defendant, but the district court subsequently dismissed the suit against AECOM. See Ministeri, 523 F. Supp. 3d at 165. The plaintiff has not challenged that dismissal.

Life Ins. Co., No. 18-10611, 2021 WL 3815929, at *1 (D. Mass. Aug. 18, 2021).

These cross-appeals followed.  In them, Reliance seeks to reverse the entry of summary judgment in favor of the plaintiff as well as the denial of its cross-motion for summary judgment, and the plaintiff seeks to augment the award of prejudgment interest by elevating the prejudgment interest rate.

## II

In the ERISA context, motions for summary judgment "are nothing more than vehicles for teeing up ERISA cases for decision on the administrative record."  Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc. (Stephanie C. I), 813 F.3d 420, 425 n.2 (1st Cir. 2016).  This posture sweeps aside "[t]he burdens and presumptions normally attendant to summary judgment practice." Id.  A district court must review de novo an ERISA claim challenging a denial of benefits where, as here, the benefit plan does not give the plan administrator discretionary authority to determine eligibility for benefits.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  Under this de novo standard, the court "may weigh the facts, resolve conflicts in the evidence, and draw reasonable inferences."  Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc. (Stephanie C. II), 852 F.3d 105, 111 (1st Cir. 2017).  The district court appropriately

recognized that the de novo standard of review applied in this case.  See Ministeri, 523 F. Supp. 3d at 166.

Our review of a district court's entry of summary judgment is de novo.  See Martinez v. Sun Life Assur. Co. of Can., 948 F.3d 62, 67 (1st Cir. 2020).  In the context of these ERISA appeals, that standard governs our review of the district court's legal conclusions.  See Tsoulas v. Liberty Life Assurance Co. of Bos., 454 F.3d 69, 76 (1st Cir. 2006); Muller v. First Unum Life Ins. Co., 341 F.3d 119, 125 (2d Cir. 2003); see also DiGregorio v. Hartford Comprehensive Emp. Benefit Serv. Co., 423 F.3d 6, 13 (1st Cir. 2005).  Even so, we assay the district court's embedded factual findings only for clear error.  See Doe v. Harvard Pilgrim Health Care, Inc., 904 F.3d 1, 10 (1st Cir. 2018).

With these standards in place, we first address Reliance's appeal.  A trio of issues demands our attention: whether Ministeri was covered by his basic life insurance at the time of his death; whether Ministeri was covered by his supplemental life insurance at that time; and whether the amount of the supplemental life insurance benefit, if available at all, was obliterated by the application of the insurance policy's so-called "cap."

**A**

The group life insurance policy subscribed to by Ministeri covered only those individuals who belonged to an

- 9 -

"Eligible Class[]." For Ministeri, the relevant class was "Active . . . Part-time Corporate Vice President" at AECOM. The terms "Active" and "Corporate Vice President" are not defined in the policy. "Part-time" is defined as "working for [AECOM] for a minimum of 20 hours during a person's regularly scheduled work week." The policy provides that "insurance . . . will terminate" on "the date the Insured ceases to be in a class eligible for this insurance."

The parties agree that, if Ministeri was still within the eligible class on August 8, 2014 (his last day of work before the pulmonary embolism occurred and his formal leave commenced), then his basic life insurance coverage would have been in place when he died on October 2, 2015. That is so because the policy's continuation provision allows continued coverage for twelve months if "the Insured ceases to be eligible . . . due to illness or injury." Under this provision, coverage would be extended until August 8, 2015. And because Ministeri died less than sixty days after that date, he would automatically be covered under the policy's conversion provision — a provision that applies only to the basic insurance. Seen in this light, it is apparent that Ministeri's coverage for basic life insurance at the time of his death hinges on whether he was still within the eligible class when he took leave on August 8, 2014.

- 10 -

Reliance submits that by the time Ministeri took leave in August, he no longer qualified as an "Active . . . Part-time Corporate Vice President."  Ministeri lost that status, Reliance says, as far back as May 2, 2014 (when he began working exclusively from home and soon found himself beset with medical appointments).  In support of this thesis, Reliance makes two arguments.  First, it argues that the at-home work Ministeri performed after May 2 was not the kind of work expected of an "Active . . . Corporate Vice President" because Ministeri's usual duties required frequent travel and attendance at meetings.  Second, it argues that even if Ministeri's at-home work qualified under the policy, he was not doing enough of it after May 2 to achieve the twenty-hour weekly benchmark.  We find both arguments wanting.

**1**

Our analysis of Reliance's first argument starts with the premise that "provisions of an ERISA-regulated employee benefit plan must be interpreted under principles of federal common law," which "embodies commonsense principles of contract interpretation" such as giving effect to the language's "plain, ordinary, and natural meaning."  Filiatrault v. Comverse Tech., Inc., 275 F.3d 131, 135 (1st Cir. 2001).  In undertaking this interpretive mission, we "may refer to dictionaries to help elucidate the common understanding of terms, although dictionary

definitions are not controlling." Martinez, 948 F.3d at 69 (citing Littlefield v. Acadia Ins. Co., 392 F.3d 1, 8 (1st Cir. 2004)).

Sometimes, this linguistic probe hits a dead end because the terms of an ERISA-regulated insurance policy are ambiguous. In such an event — and if review of the benefit decision is de novo — we apply "the doctrine of contra proferentem."[2]  Id.  That doctrine teaches that unclear "term[s] must be construed in favor of" the insured.  Id.; see Hughes v. Bos. Mut. Life Ins. Co., 26 F.3d 264, 268-69 (1st Cir. 1994).  This entrenched canon reflects the insight that insurance policies are typically contracts of adhesion:  the insurance company drafts the policy and the insured, rarely able to negotiate the terms, is left high and dry unless he accedes to the proffered terms.  See Mut. Life Ins. Co. of N.Y. v. Hurni Packing Co., 263 U.S. 167, 174 (1923) ("[I]t is consistent with both reason and justice that any fair doubt as to the meaning of [the insurance company's] own words should be resolved against it."); Kunin v. Benefit Tr. Life Ins. Co., 910 F.2d 534, 540 (9th Cir. 1990) (similar in ERISA context).

We hasten to add, however, that the doctrine of contra proferentem does not leave the insurer at the mercy of the insured.

---

[2] If review of a benefit decision is deferential because the policy grants the insurer interpretive discretion, the doctrine of contra proferentem has no application.  See Lavery v. Restoration Hardware Long Term Disab. Benefits Plan, 937 F.3d 71, 78 (1st Cir. 2019); Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 93-94 (1st Cir. 2008).

Courts may not indulge fanciful readings, chimerical interpretations, or "torture[d] language" to find "nuances the contracting parties neither intended nor imagined." Burnham v. Guardian Life Ins. Co. of Am., 873 F.2d 486, 489 (1st Cir. 1989). With specific reference to the ERISA context, "contract language is ambiguous only 'if the terms are inconsistent on their face' or 'allow reasonable but differing interpretations of their meaning.'" Martinez, 948 F.3d at 69 (quoting Rodriguez-Abreu v. Chase Manhattan Bank, 986 F.2d 580, 586 (1st Cir. 1993)).

Here, the phraseology of "Active . . . Part-time Corporate Vice President" contains important ambiguities. Neither "Active" nor "Corporate Vice President" is defined in the policy. Citing a dictionary, Reliance says "active" means "doing something as you usually do, or being able to do something physically or mentally." Active, Cambridge Dictionary, https://dictionary.cam bridge.org/us/dictionary/english/active (last visited July 21, 2022). Relatedly, Reliance mentions the duties listed in AECOM's job description for Ministeri's role: "[t]ravel to be 90%, with at least 50% regionally based (East Coast) and 50% to represent the rest of the country and international travel." And, finally, Reliance cites the comments that it received from AECOM's representative to the effect that, after May 2, "Ministeri was not able or expected to perform his job at home, as the job required regular and frequent travel throughout the United States to

- 13 -

clients."  Putting these pieces together, Reliance posits that because Ministeri "was physically unable to perform these required duties" after May 2, "he did not satisfy the 'Active' requirement."[3]

Even assuming for argument's sake that Reliance's reading of "Active" is reasonable and that its understanding of Ministeri's role is accurate, the policy language can be reasonably interpreted differently.  As the Tenth Circuit observed when confronted with a similar contract issued by Reliance, the word "active" in this context can reasonably mean "current employee." Carlile v. Reliance Standard Life Ins. Co., 988 F.3d 1217, 1227 (10th Cir. 2021); see id. at 1224 (rejecting "Reliance's argument that the dictionary definition of 'active' unambiguously means 'actually working'").  Similarly, the Fourth, Fifth, and Sixth Circuits have rejected kindred arguments made by Reliance and concluded that the term "active," as used in policies that mirror the one at issue here, is ambiguous and must be construed against the insurer.  See Miller v. Reliance Standard Life Ins. Co., 999 F.3d 280, 285 (5th Cir. 2021) (holding that Reliance policy's

---

[3] Reliance makes a related argument that, after May 2, Ministeri no longer satisfied the "Corporate Vice President" requirement because he "was not performing the actual tasks of a Corporate Vice President as identified by AECOM."  But Reliance then clarifies that the term "Active" is the basis for its argument that Ministeri's job "[t]itle alone is not enough" to qualify him as a Corporate Vice President.  We therefore consider these arguments together, treating the phrase as a whole.

- 14 -

"phrase 'active, full-time' employees must be construed in the insured's favor to include those who, on the relevant date, are current employees even if not actually working"); Wallace v. Oakwood Healthcare, Inc., 954 F.3d 879, 894 (6th Cir. 2020) (concluding that "'[a]ctive' could also mean non-retired"); Tester v. Reliance Standard Life Ins. Co., 228 F.3d 372, 376 (4th Cir. 2000) ("Reliance's construction of the term 'active' does not eliminate the ambiguity . . . because it unreasonably restricts coverage to the time that an employee is actually at work.").

In solidarity with our sister circuits, we hold that the phrase "Active . . . Corporate Vice President" in this policy is ambiguous and must be construed against Reliance. We believe that, under a reasonable construction of this phrase, Ministeri could be regarded as an "Active . . . Corporate Vice President" as long as he was a non-retired employee holding a job title matching the rank of Corporate Vice President. It is undisputed — and the district court found — that Ministeri was a current employee until he formally took leave on August 8, 2014 and that he had not "received a demotion or lower title." Ministeri, 523 F. Supp. 3d at 172. In view of those facts, Reliance's first argument founders.

**2**

Reliance's next argument addresses the quantity, rather than quality, of Ministeri's at-home work after May 2.

- 15 -

Specifically, Reliance contends that Ministeri was working less than twenty hours per week and therefore dropped out of the "Part-time" category.

The policy defines "Part-time" as "working for [AECOM] for a minimum of 20 hours during a person's regularly scheduled work week."  Although Ministeri continued to submit, and his supervisor continued to approve, timesheets reflecting twenty-four hours of work each week after May 2 until he took leave in August, Reliance scoffs that these timesheets are plainly unreliable.  It notes, for example, that the timesheets claim a full eight hours of work on several days on which Ministeri had medical appointments for his glioblastoma, including one day on which he underwent a biopsy and another day on which a hospital note records that he "FELL STANDING WITH CANE OUTSIDE OF LOBBY AFTER CHEMO AND RADIATION FOR BRAIN CA[NCER]."  Pointing to Ministeri's myriad of medical appointments and his severely debilitating symptoms, Reliance says that he simply could not have worked twenty hours per week after May 2 and, thus, was no longer "Part-time" at AECOM within the meaning of the policy.

We disagree with the central thrust of Reliance's suggestion.  The district court acknowledged that the timesheets are suspect and that "Ministeri did not keep careful track of his time," perhaps because he "was a high-level employee at AECOM" and was allowed some leeway in this respect.  Ministeri, 523 F. Supp.

3d at 170. Ultimately, though, the district court did not make a finding as to whether Ministeri worked at least twenty hours every week after May 2.[4] See id. at 172 n.8. Nor do we deem such a factual finding indispensable: regardless of exactly how many hours Ministeri worked during this period and regardless of the reliability of the timesheets, the term "Part-time" is reasonably susceptible of a construction broad enough to encompass Ministeri's situation. We explain briefly.

Under the policy, Ministeri remained within the eligible class while he worked at least "20 hours during [his] regularly scheduled work week." The phrase "regularly scheduled work week" is not defined. Reliance urges us to read this provision as denoting an employee "who regularly works twenty hours a week." In Reliance's view, this means that we must evaluate Ministeri's actual work routine following the onset of his medical difficulties week by week, to see how frequently he worked a minimum of twenty hours in each such week. For example, to decide whether Ministeri was still within the eligible class on August 8, 2014 (before his leave), Reliance would have us examine his routine in the weeks

---

[4] The district court did find that, even after May 2, "Ministeri was able to manage [his] symptoms and continue working" at least twenty hours per week "regularly," though perhaps not every week. Ministeri, 523 F. Supp. 3d at 172 & n.8. Reliance contends that this finding is clearly erroneous. We take no view of this question because, as explained in the text, Ministeri was eligible regardless of how many hours he worked during that period.

leading up to that date and determine whether he regularly worked at least twenty hours a week in that window.

Perhaps that is one reasonable interpretation of the "Part-time" definition. But there is another straightforward — and decidedly reasonable — way to read "regularly scheduled work week." That is to read "regularly scheduled work week" as denoting any week that is not disrupted by holidays or other sanctioned time off, such as vacation days, sick days, or personal days. On such a reading, the question is whether Ministeri was working at least twenty hours during such ordinary weeks. In the period after May 2, Ministeri's regular work schedule was overtaken by an onslaught of symptoms, procedures, treatments, and appointments. All of these appointments were sanctioned, at least implicitly, by AECOM. We think that Ministeri's work weeks in this time frame could reasonably be described as irregularly scheduled and, thus, whether he managed to work at least twenty hours a week during this interval is beside the point. See Tester, 228 F.3d at 374, 377 (holding, under materially identical Reliance policy provision, that employee who had been on medical leave for five weeks before death was covered because she "was working for [the employer] on a regular basis and . . . was simply out sick when she died"). To sum up, the eligibility provision requiring Ministeri to work at least twenty hours "during [his] regularly

scheduled work week" could reasonably refer to his typical weekly workload before the chaos introduced by his medical condition.[5]

On this reading, the work weeks in April of 2014 furnish clear examples of Ministeri's "regularly scheduled work week." And the record is unequivocal:  in April of 2014, AECOM hired Ministeri with the expectation that he would work twenty-four hours a week, which he unarguably did during that month.[6]  The weeks that followed were (as we have explained) irregularly scheduled work

---

[5] The term "regularly scheduled work week" might also reasonably be read as referring to the employee's schedule as established by his job description upon hiring, regardless of whether the employee in fact kept to that schedule. See Miller, 999 F.3d at 285 (applying contra proferentem and holding "that the term 'regular work week' must be construed to refer to an employee's job description, or to his typical workload when on duty"); Wallace, 954 F.3d at 894 (holding that provision requiring employee to "work[] . . . for a minimum of 30 hours during a person's regular work week" could "be reasonably interpreted to mean that a person's job description requires that person to work thirty hours a week").  On this interpretation, Ministeri would have remained "Part-time" until his leave for the simple reason that he was hired to work more than twenty hours per week.  But — as we explain in the text — Ministeri remained "Part-time" even if the policy is read to require some factual assessment of the hours that he actually worked "during [his] regularly scheduled work week."

[6] Even though the record indicates that Ministeri began experiencing some symptoms early in April of 2014, and the Social Security Administration (SSA) later found that he "became disabled" on April 10, 2014, Reliance concedes that Ministeri "continued to work until his business trip on May 2, 2014."  In any event, the SSA's finding was based on Ministeri's statement in January of 2015.  The district court found that this "statement deserves no weight" because Ministeri was by then severely confused. Ministeri, 523 F. Supp. 3d at 171.  Discerning no clear error, we accept this factual determination and disregard the SSA finding.

weeks. Construing the ambiguous terms in the policy against Reliance — as we must — there was no requirement that Ministeri work any specific number of hours during those weeks. Consequently, we conclude that Ministeri was working "Part-time" within the policy's meaning at least until he formally took leave on August 8, 2014.

**3**

Continuing to resist the conclusion that Ministeri was within the eligible class after May 2, 2014, Reliance leans heavily on our decision in Burnham, 873 F.2d 486. That decision, however, cannot support the weight that Reliance places upon it.

In Burnham, we held that an employee working from the hospital and from home while receiving radiation therapy was not covered by a group life insurance policy, which defined "full-time Employee" as one who "regularly works at least 30 hours per week . . . at his [employer's] business establishment." Id. at 487-90. The work requirement in Burnham, though, lacked the qualification that it applied only "during [the employee's] regularly scheduled work week." That qualifying language — as reasonably construed, favorably to the insured — allows us to disregard Ministeri's work during the period when his schedule became irregular. The policy in Burnham was less forgiving, indicating that the location and hours benchmarks must be met "regularly" even during a period of hospitalization. In other

words, the question before us is whether Ministeri was "Active" and "working . . . a minimum of 20 hours during [his] regularly scheduled work week."  Burnham did not construe those terms and is neither controlling nor instructive here.

4

The short of it is that Ministeri fell within a reasonable construction of the "Active . . . Part-time Corporate Vice President" provision at least through August 8, 2014 (when he went on leave).  With that date fixed and tacking on the policy's provisions for a one-year continuation and sixty-day conversion, it necessarily follows that Ministeri's basic life insurance coverage was in effect when he died on October 2, 2015.

B

At the time of his death, Ministeri's basic life insurance coverage was in effect through the policy's conversion provision.  The policy states, however, that this provision does not apply to the supplemental coverage.  Instead, the policy's portability provision determined whether Ministeri's supplemental life insurance could outlast the twelve-month continuation period that ended in August of 2015.  Under that provision, the satisfaction of certain enumerated requirements allows supplemental coverage to be transported to the insured outside of the usual eligibility criteria.

- 21 -

The parties agree that all of the portability requirements were satisfied in this case save for one (which is in dispute). That requirement provides that the insured must "notif[y] [Reliance] in writing within sixty (60) days from the date he/she ceases to be eligible." We henceforth refer to this written notification as an "application" for portability. Reliance asserts that Ministeri never submitted such a written application for portability and, thus, that his supplemental coverage was not in effect when he perished.

The district court concluded that it was "unable to determine whether Mr. Ministeri provided timely notice on this record." Ministeri, 523 F. Supp. 3d at 176. But the court found this lack of certitude irrelevant: it noted that Reliance had never mentioned this deficiency in its correspondence with the plaintiff and, therefore, Reliance breached its obligation under ERISA to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial." 29 U.S.C. § 1133(1) (emphasis supplied); see Ministeri, 523 F. Supp. 3d at 177. The court proceeded to find that this violation had prejudiced the plaintiff and — as an equitable remedy — barred Reliance from raising Ministeri's failure to apply for portability. Id. at 178. As a result, the court held that

Ministeri was covered for supplemental life insurance when he died.[7]  Id.

Judicial interpretations of ERISA's requirements are reviewed de novo.  See Jette v. United of Omaha Life Ins. Co., 18 F.4th 18, 26 (1st Cir. 2021).  The district court's finding of prejudice due to the insurer's violation, though, is a factual finding that engenders review only for clear error.  See id. at 32 (citing Santana-Díaz v. Metro. Life Ins. Co., 816 F.3d 172, 182 (1st Cir. 2016)); DiGregorio, 423 F.3d at 13.  With respect to "the selection of a remedy in an ERISA case," we have made pellucid that the "district court enjoys considerable latitude" and, accordingly, appellate review of such decisions is for abuse of discretion.  Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan, 705 F.3d 58, 68 (1st Cir. 2013).

After careful consideration, we affirm the district court's decision to bar Reliance from raising the missing portability application as a defense against the plaintiff's claim for supplemental coverage.  Our reasoning follows.

_____

[7] The district court held, in the alternative, that Reliance was barred from raising the absence of a portability application because of its purported breach of a separate notice requirement.  See Ministeri, 523 F. Supp. 3d at 178-80.  Because we uphold the district court's decision to bar Reliance from raising this issue on the ground of Reliance's ERISA violation, we take no view of the district court's alternative holding.

- 23 -

We need not belabor the fact of Reliance's ERISA violation. ERISA and its implementing regulations clearly mandate that any denial of benefits claimed must be accompanied by a written notice "setting forth the specific reasons for such denial." 29 U.S.C. § 1133(1); see 29 C.F.R. § 2560.503-1(g)(1), (j)(1). As we have explained, "a plan administrator, in terminating or denying benefits, may not rely on a theory for its termination or denial that it did not communicate to the insured prior to litigation." Stephanie C. II, 852 F.3d at 113.

Reliance's written denial letters to the plaintiff discuss only the issue of Ministeri's qualification for the eligible class; they are silent on portability. To the extent that Reliance now attempts to ground its denial of supplemental coverage on Ministeri's failure to apply for portability, that attempt is problematic. Reliance chose "to hold that basis in reserve rather than communicate it to the beneficiary," thereby thwarting "a full and meaningful dialogue regarding the denial of benefits." Glista v. Unum Life Ins. Co. of Am., 378 F.3d 113, 129 (1st Cir. 2004).

There is no merit to Reliance's protest that it had no obligation to mention the portability-application deficiency until the issue was first raised by the plaintiff. The plaintiff's initial claim for benefits encompassed the supplemental life

insurance amount.  As the district court found, Reliance immediately investigated whether Ministeri had submitted an application for porting and determined that he had not.  Ministeri, 523 F. Supp. 3d at 176.  Thus, Reliance evidently had "available sufficient information to assert" the lack of a portability application as "a basis for denial of benefits."  Glista, 378 F.3d at 129.  It should have put its cards on the table then and there.  But it chose to keep quiet about its discovered basis for denial until litigation ensued.  That is precisely the sort of delayed reaction that ERISA forbids.

**2**

The closer question is whether the plaintiff was prejudiced by Reliance's violation.  As a general matter, establishing prejudice in the ERISA setting requires that the plaintiff show that, but for the violation, "the outcome in [her] case might have been different."  Santana-Díaz, 816 F.3d at 182 n.11.  We have found prejudice when, for instance, an insurer's "failure to put [a claimant] on notice of a fact . . . precluded him from making a 'substantial argument.'"  Lavery v. Restoration Hardware Long Term Disability Benefits Plan, 937 F.3d 71, 83 (1st Cir. 2019) (quoting Bard v. Bos. Shipping Ass'n, 471 F.3d 229, 243 n.20 (1st Cir. 2006)).

The court below found that the plaintiff was prejudiced by Reliance's failure to furnish notice of Ministeri's missing

portability application because she was "deprived . . . of a meaningful opportunity to challenge" this rationale during the administrative claims process. Ministeri, 523 F. Supp. 3d at 178. The court added that a remand for further administrative proceedings would not ameliorate this harm because the plaintiff had

> argued for summary judgment on the narrow theory that her husband had worked until August 8, 2014 — an argument the [district court] found persuasive. . . . Had Reliance timely informed Mrs. Ministeri of its [portability-application] rationale, she may well have adopted a different litigation strategy such as, for example, drawing upon favorable precedent in Tester, 228 F.3d at 373-77, and Carlile [v. Reliance Standard Ins. Co., 385 F. Supp. 3d 1180, 1186-88 (D. Utah 2019)], to argue her husband retained eligibility until a later date — avoiding the [portability-application] issue altogether. Were the [district court] to remand, Mrs. Ministeri would be bound by her earlier arguments (and [the district court's] findings) when presenting her claim to Reliance, creating a situation in which Reliance might very well benefit from its failure to comply with ERISA's requirements.

Id.

We understand the district court's theory of prejudice to run along the following lines: if the plaintiff had been apprised of the portability-application problem during the administrative process, as ERISA demands, then she might have argued that her husband was still within the eligible class at

- 26 -

least a few days into October of 2014.[8]  If that argument were successful, then — given the twelve-month continuation period — Ministeri would have been fully covered for supplemental insurance at the time of his death without any need to apply for portability. But the plaintiff is now locked into arguing that Ministeri dropped out of the eligible class in August of 2014, which potentially creates a problem for her portability claim due to the missing application.  The prejudice suffered by the plaintiff, as found by the district court, thus lies in foreclosing her substantial argument that her husband was still eligible at least into October of 2014.[9]

Curiously, Reliance's briefs do not say a word about the district court's theory of prejudice.  Reliance does baldly assert that any ERISA violation on its part was merely technical and caused no harm.  But it wholly fails to address the rationale

---

[8] Although the district court framed this argument as "a different litigation strategy," Ministeri, 523 F. Supp. 3d at 178, we think it is fairly implied in the court's reasoning that the plaintiff might have first made this same argument directly to Reliance during the administrative proceedings.

[9] The district court also suggested that Reliance's failure to disclose the portability rationale in a timely fashion deprived the plaintiff of the opportunity to conduct discovery into this matter during litigation.  See Ministeri, 523 F. Supp. 3d at 176; cf. Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 520 (1st Cir. 2005) (explaining that it may be appropriate for courts to consider "evidence outside the administrative record" if plaintiff claims "prejudicial procedural irregularity in the ERISA administrative review procedure").  We do not read the court's decision as incorporating this purported deprivation into its prejudice finding.

underpinning the district court's finding to the contrary. Reliance does not develop any argument, for example, that the plaintiff suffered no prejudice because — under any reasonable reading of the policy and interpretation of the record — Ministeri could not have been within the eligible class in October of 2014. Although Reliance argues at length that Ministeri lost eligibility after May 2, 2014, it has nothing to say about why — if that argument is incorrect and Ministeri was still within the class in August (as we already have determined) — the plaintiff could not plausibly have contended that Ministeri remained in the class well into October. We therefore deem any such argument waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (reiterating "the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). And in light of that waiver, Reliance has failed to show that the district court's finding of prejudice was clearly erroneous.

There is one loose end. Instead of attacking the district court's articulated theory of prejudice, Reliance argues that the plaintiff was not prejudiced by detrimental reliance on a post-mortem letter, sent by Reliance and addressed to Ministeri, in which Reliance suggested that he was fully covered at the time of his death. The district court stated that this letter "compound[ed] the harm of Reliance's failure to timely disclose

its [portability-application] rationale." Ministeri, 523 F. Supp. 3d at 178. That statement, however, was merely a prelude to the district court's prejudice determination — a determination that rested entirely on its independent finding that the ERISA violation "deprived [the plaintiff] of a meaningful opportunity to challenge" the portability rationale during the claims process and "engendered detrimental reliance" by the plaintiff in foreclosing "a different litigation strategy." Id. When the wheat is sorted from the chaff, the post-mortem letter is immaterial.

To say more about this issue would be pointless. We detect no clear error in the district court's finding of prejudice and, therefore, uphold that finding.

**3**

This brings us to the question of the district court's chosen remedy. We review that choice of remedy for abuse of discretion, mindful that the "district court enjoys considerable latitude" in selecting a remedy. Colby, 705 F.3d at 68. Under that "highly deferential" standard, we will reverse "only 'when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them.'" González-Rivera v. Centro Médico del Turabo, Inc., 931 F.3d 23, 27 (1st Cir. 2019) (quoting Indep. Oil & Chem.

Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988)).

Section 502(a)(3)(B) of ERISA grants courts the authority to provide "other appropriate equitable relief (i) to redress [ERISA] violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3)(B). "[T]his power encompasses an array of possible responses when the plan administrator relies in litigation on a reason not [previously] articulated to the claimant." Glista, 378 F.3d at 131. In selecting an appropriate remedy, a court should abjure one-size-fits-all rules and instead evaluate the features of each particular case. See Bard, 471 F.3d at 236.

In some cases, the most appropriate remedy will be "to remand to a plan administrator for reconsideration." Id. at 245-46 (citing Buffonge v. Prudential Ins. Co. of Am., 426 F.3d 20, 31-32 (1st Cir. 2005)). In other cases, though, the most appropriate remedy will be barring the insurance company from raising an improperly withheld defense. See id. at 244-46; Glista, 378 F.3d at 131-32. Everything depends on context, but "[w]e typically have only barred a plan from asserting defenses to coverage not articulated to the insured when the lack of notice resulted in prejudice to the insured." Martinez, 948 F.3d at 68; cf. CIGNA Corp. v. Amara, 563 U.S. 421, 443 (2011) ("[W]hen a court exercises its authority under § 502(a)(3) to impose a remedy

- 30 -

equivalent to estoppel, a showing of detrimental reliance must be made. But this showing is not always necessary for other equitable remedies.").

The district court appropriately conducted a prejudice inquiry before deciding to cure the ERISA notice violation by foreclosing Reliance from raising the defense. It found prejudice, and Reliance has waived any challenge to that finding. See supra Part II(B)(2).

The district court considered the possibility of a remand but rejected that possibility, concluding that Reliance's violation "engendered detrimental reliance" and that a remand would "creat[e] a situation in which Reliance might very well benefit from its failure to comply with ERISA's requirements." Ministeri, 523 F. Supp. 3d at 178. A remand here would serve only to lock the barn door after the horse had galloped away. In the circumstances of this case, we are satisfied that the district court weighed the appropriate factors and adopted a remedy consistent with its view of the equities and with our precedents.

Reliance does not go quietly into this dark night. Taking aim at the district court's chosen remedy, Reliance brandishes our decision in Watson v. Deaconess Waltham Hospital for the proposition that "[t]echnical violations of ERISA's notice provisions generally do not give rise to substantive remedies outside § 1132(c) unless there are some exceptional circumstances,

such as bad faith, active concealment, or fraud." 298 F.3d 102, 113 (1st Cir. 2002). Watson, however, does not move the needle. There, we contrasted such "[t]echnical violations" with cases in which the plaintiff has shown "prejudice." Id. (citing Terry v. Bayer Corp., 145 F.3d 28, 39 (1st Cir. 1998) and Govoni v. Bricklayers, Masons & Plasterers, 732 F.2d 250, 252 (1st Cir. 1984)). Because we have upheld the district court's finding of prejudice due to the ERISA notice violation, see text supra, our precedent plainly permits the remedy of pretermitting Reliance's belated rationale. See Martinez, 948 F.3d at 68. It makes no difference whether Reliance acted in good faith. See Bard, 471 F.3d at 244 & n.21.

Reliance tries to place one more landmine in the plaintiff's path. It argues that barring it from raising a defense is inconsistent with our decision in Glista. Once again, we disagree.

In Glista, part of our justification for barring the insurer from invoking a late-blooming rationale was that this rationale was an exclusion for which the insurer ordinarily bears the burden of proof. See 378 F.3d at 131. Here, in contrast, the absence of a portability application is a defense, not an exclusion. Reliance is correct that this case differs somewhat from Glista. But that is a distinction without a material difference. Glista does not hold that the equitable remedy of

barring a line of argument applies only to exclusions. And we have since repeatedly approved the deployment of this remedy to bar ordinary defenses, not only exclusions. See, e.g., Lavery, 937 F.3d at 84; Bard, 471 F.3d at 244-45. The district court acted comfortably within the encincture of its discretion in doing so here.

That ends this aspect of the matter. We hold that the district court did not abuse its discretion under section 503(a)(3)(B) by barring Reliance from raising the absent portability application as a defense to the plaintiff's claim for supplemental coverage. And because that missing application was the only obstacle to the availability of supplemental coverage here, we affirm the district court's decision entitling the plaintiff to recover the supplemental life insurance proceeds.

**C**

All that is left of Reliance's assault on the district court's judgment is the insurance-cap provision. That provision, Reliance says, precludes any recovery of supplemental insurance proceeds in this instance.

The paragraph containing the insurance-cap provision states in relevant part:

> The amount of Supplemental Insurance coverage available under the Portability provision will be the current amount of coverage the Insured . . . is insured for under this Policy on the last day he/she was Actively at Work.

- 33 -

> However, the amount of coverage will never be
> more than . . . a total of $500,000 from all
> [Reliance] group life and accidental death and
> dismemberment insurance combined . . . .

According to Reliance, the second sentence means that once its coverage exceeds a total of $500,000 from all Reliance insurance policies, it is impossible to add to that amount through portability. Thus, Reliance says, "[b]ecause Mr. Ministeri already had [$624,000] in Basic Life coverage, which is above the $500,000 cap, there were no Supplemental Life benefits to port."

The district court demurred. It read this sentence, in context, as capping only the total supplemental coverage amount at $500,000, without regard to how much was due under the basic life insurance. See Ministeri, 523 F. Supp. 3d at 181.

We have little difficulty in rejecting Reliance's interpretation of the insurance-cap provision. Even if that interpretation was reasonable — a matter on which we take no view — it is served up with a generous helping of ambiguity. Read in light of the immediately preceding sentence, the insurance-cap provision reasonably can be read as stating that the total amount of supplemental coverage available through portability (that is, the sum of portable coverage "from all [Reliance] group life and accidental death and dismemberment insurance combined") will never be more than $500,000 — without implicating any coverage outside portability, such as the basic life insurance amount. At a

- 34 -

minimum, then, there are two "reasonable but differing interpretations" of the cap provision, and so the doctrine of contra proferentem tips the scales in favor of the insured. Martinez, 938 F.3d at 69 (quoting Rodriguez-Abreu, 986 F.2d at 586).

We conclude that the $500,000 insurance-cap provision refers only to the amount of supplemental insurance available through portability.  Because Ministeri's supplemental insurance was less than $500,000, this cap does not reduce the plaintiff's recovery.

## III

We turn next to the plaintiff's cross-appeal, which implicates the district court's choice of a prejudgment interest rate.  ERISA does not expressly provide for an award of prejudgment interest.  But we have held that whether to provide such a remedy and, if so, what interest rate should be applied are questions that lie within the discretion of the district court.  See Gross v. Sun Life Assurance Co. of Can., 880 F.3d 1, 19 (1st Cir. 2018) (citing Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220, 223 (1st Cir. 1996), abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242 (2010), and Enos v. Union Stone, Inc., 732 F.3d 45, 50 (1st Cir. 2013)).  We "have identified two primary considerations" that inform the choice of rate:  "making the plan participant 'whole for the period during

which the fiduciary withholds money legally due'" and "prevent[ing] unjust enrichment." Id. at 19-20 (quoting Cottrill, 100 F.3d at 224). We review the district court's chosen rate for abuse of discretion. See Enos, 732 F.3d at 50.

The plaintiff asked the district court to apply the Massachusetts statutory prejudgment interest rate of 12%. See Mass. Gen. Laws ch. 231, § 6C. Reliance countered by asking the district court to use the average federal prime interest rate, which it maintained (without contradiction) was approximately 4.5% during the relevant time frame. In an unpublished order, the district court said that — on the one hand — it was "unconvinced" that the plaintiff would have achieved a 12% return had Reliance promptly paid out the claim and that she "failed to establish to the [district court's] satisfaction the rate of return Reliance enjoyed from its wrongful use of her funds." The court added that — on the other hand — it was "unsatisfied with Reliance's proposal" because "the federal prime interest rate . . . understates actual market conditions." In the end, the court split the baby: it boosted the average federal prime interest rate by three percentage points and applied a prejudgment interest rate of 7.5%.

The plaintiff argues that this number is too low given her speculations as to Reliance's actual rate of return on its investments. To fuel this guesswork, the plaintiff points to a 12.5% gain in the Dow Jones Industrial Average for the period and

to an 18% return on shares of stock in Reliance's parent company. The district court, she contends, should have used a prejudgment interest rate no less robust than 12%. Anything less would allow Reliance to get away with unjust enrichment. See Gross, 880 F.3d at 20 ("Awarding interest at a rate that does not recapture the lost value of the money during the period it was withheld 'would create a perverse incentive' for a defendant to delay payments while it earned interest on those funds." (quoting Pacific Ins. Co. v. Eaton Vance Mgmt., 369 F.3d 584, 590 n.8 (1st Cir. 2004))).

We reject the plaintiff's importunings. The district court, we think, acted within its discretion in refusing to base its interest-rate determination on the plaintiff's conjectural tabulation, absent more specific evidence of Reliance's actual rate of return.[10]

The plaintiff has a fallback position: she argues that the district court did not adequately explain its reasoning for selecting its chosen rate. This argument lands closer to the mark. The district court simply added three percentage points to the average federal prime interest rate without explaining why it chose

---

[10] The plaintiff suggests that she was blocked from adducing evidence of Reliance's actual rate of return by the district court's denial of her motion for discovery beyond the administrative record. This suggestion is baseless. Her motion for discovery was extremely narrow, relating only to specific questions that she had about the administrative record. The motion had no bearing on the performance of Reliance's investments.

three points instead of, say, one point or five points. In at least one instance, we have vacated and remanded an award of prejudgment interest when we were "unable to evaluate the court's judgment call because it did not explain its reasoning, and its rationale [was] not apparent from the record." Id. at 21.

Although more explicit reasoning would have been helpful, we think that the court's rationale for selecting the rate is sufficiently "apparent from the record." Enos, 732 F.3d at 50. The court first tried to ascertain either Reliance's actual rate of return on its investments during the relevant period or the rate the plaintiff could have realized. On both fronts, it supportably found the evidence before it wanting. In that void, the court was left to approximate. It narrowed the range to somewhere between the federal prime rate suggested by Reliance (which it found too skimpy) and the Massachusetts statutory rate suggested by the plaintiff (which it found too rich). In the end, the court landed upon a rough midpoint — albeit one tilted slightly toward Reliance's position.

A district court acts within its discretion when it selects a rate that "could be expected to 'approximate the likely return on the funds withheld.'" Gross, 880 F.3d at 22 (alteration omitted) (quoting Cottrill, 100 F.3d at 225). The court below evidently aimed for that mark, and we cannot say that it missed the mark by so great a margin as to exceed the broad scope of its

discretion. With respect to prejudgment interest as an equitable remedy, we have never required absolute precision. Cf. Fox v. Vice, 563 U.S. 826, 838 (2011) (explaining, in context of determining reasonable attorneys' fee under fee-shifting statutes, that "trial courts need not, and indeed should not, become green-eyeshade accountants" and that their goal "is to do rough justice, not to achieve auditing perfection"). And we must bear in mind that abuse-of-discretion review generally measures the decision below against "the existing record before the district court when it ruled." United States v. Velazquez-Fontanez, 6 F.4th 205, 221 (1st Cir. 2021); see Crawford v. Clarke, 578 F.3d 39, 44 (1st Cir. 2009) (similar). The fuzzier the evidence before the district court, the rougher its approximation may turn out. On this record, we conclude that the court did not abuse its broad discretion in selecting a prejudgment interest rate of 7.5%. See, e.g., Spears v. Liberty Life Assurance Co. of Bos., No. 11-1807, 2020 WL 2404973, at *5-6 (D. Conn. May 12, 2020) (rejecting similar arguments for application of state statutory interest rate in ERISA action and selecting federal prime rate of 4.27%); Smith v. Jefferson Pilot Fin. Ins. Co., No. 07-10228, 2010 WL 818788, at *3 (D. Mass. Mar. 5, 2010) (selecting prejudgment interest rate of 6% in ERISA action, based on federal prime rate).

## IV

We need go no further. We direct that three-fourths costs be taxed in favor of the plaintiff. And for the reasons elucidated above, the judgment of the district court is

**Affirmed**.