# United States Court of Appeals
## For the First Circuit

No. 01-1409

GILLES FILIATRAULT,

Plaintiff, Appellant,

v.

COMVERSE TECHNOLOGY, INC. AND BOSTON TECHNOLOGY, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Morris E. Lasker, Senior U.S. District Judge]

Before

Selya, Circuit Judge,

Rosenn* and Cyr, Senior Circuit Judges.

Paul J. Murphy, with whom Menard, Murphy & Walsh LLP was on brief, for appellant.
Christopher J. Perry, with whom Catherine M. Stockwell and Hale and Dorr LLP were on brief, for appellees.

December 27, 2001

_____
*Of the Third Circuit, sitting by designation.

**SELYA, Circuit Judge.** Plaintiff-appellant Gilles Filiatrault brought suit under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461 (1994 & Supp. V 1999), and specifically, 29 U.S.C. § 1132(a)(1)(B) (authorizing a private action by a participant in, or beneficiary of, an ERISA-regulated plan "to recover benefits due . . . under the terms of [the] plan"). The lower court found the plaintiff's claims lacking in merit and entered summary judgment for the defendants. We affirm.

## I.

### Background

In this suit, the plaintiff seeks to collect benefits allegedly due under an employee severance benefit plan (the Plan) maintained by his quondam employer, defendant-appellee Boston Technology, Inc. (BTI). The relevant facts are largely undisputed. We begin with a decurtate summary.

In 1997, the plaintiff was a mid-level manager, employed by BTI and covered by the Plan. On August 20, 1997, BTI agreed to merge at a future date (January 14, 1998) into defendant-appellee Comverse Technology, Inc. (CTI) in a tax-free, stock-for-stock transaction. BTI would then dissolve.

On October 24, 1997, BTI terminated the plaintiff's employment, and the plaintiff responded by demanding payment of

-2-

severance benefits under the Plan. Although the merger had not been consummated when BTI terminated his employment, the plaintiff claimed that a "change in control" nonetheless had occurred upon the execution of the agreement to merge, thereby triggering his entitlement to severance benefits. BTI refused to honor the plaintiff's demand.

BTI merged into CTI on January 14, 1998. CTI thereafter transferred certain of its assets, including all the former assets of BTI, into a new operating unit, Comverse Network Systems, Inc. (CNSI). CTI appears to have accomplished this transfer by delivering a bill of sale to CNSI.

On June 12, 1998, the plaintiff filed suit against BTI (as the Plan's sponsor) and CTI (as BTI's successor in interest) in the federal district court. The defendants moved to dismiss for failure to state an actionable claim. See Fed. R. Civ. P. 12(b)(6). When the district court converted this motion into a motion for summary judgment, see Fed. R. Civ. P. 12(b), the defendants filed a supporting affidavit subscribed to by Adalbert K. Wnorowski (BTI's general counsel up to the time of the merger and CNSI's general counsel thereafter). The plaintiff filed an opposition to the motion and simultaneously filed a motion to withhold decision pending additional discovery. See Fed. R. Civ. P. 56(f).

Following a hearing, the district court entered partial summary judgment for the defendants and, at the same time, granted the plaintiff's Rule 56(f) motion in part (allowing the plaintiff to depose a representative of the defendants on the issues that remained outstanding). On May 18, 2000, the plaintiff deposed Wnorowski and thereafter filed a supplemental opposition, a cross-motion for summary judgment, and a motion for partial reconsideration of the district court's earlier order. On September 14, 2000, the district court granted the balance of the defendants' motion for summary judgment and denied the plaintiff's cross-motions.[1] This timely appeal followed.

## II.

## Standard of Review

We review the district court's entry of summary judgment de novo, taking the facts in the light most favorable to the summary judgment loser (here, the plaintiff). Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). Although some incidental facts are controverted, those disputes are not material. The essence of the controversy resides in the pertinent documents, and neither the contents of those documents

---

[1]Final judgment did not enter until February 9, 2001, when the district court dismissed a tagalong count. This count is not in issue here, and we make no further reference to it.

-4-

nor the facts necessary to put them into perspective are open to serious question. The Plan comes within the purview of ERISA; its relevant provisions are as stated herein; the plaintiff was a Plan participant; the terms of the agreement to merge are free from ambiguity; and the critical dates (e.g., when BTI dismissed the plaintiff and when it consummated the merger) are uncontroverted. Thus, so long as the lower court correctly construed the Plan and the agreement to merge, grasped the pertinent facts, and took them properly into account, summary judgment was appropriate. We turn to that inquiry.

## III.

## Analysis

When BTI terminated the plaintiff's employment, the Plan provided that employees who were dismissed without cause within twelve months after a "change in control" would receive certain described severance benefits. This is the focal point of the instant litigation: the plaintiff maintains that he was an employee of BTI at the time of a change in control and, accordingly, that he had an entitlement to those benefits when he thereafter was discharged without good cause. For summary judgment purposes, the defendants concede that the plaintiff can, at the least, make out a genuine issue of material fact as to termination without cause. They maintain, however, that no

change in control occurred until after the plaintiff's termination, so that he had no entitlement to severance benefits. Accordingly, this appeal hinges on the meaning of the phrase "change in control."

## A.

## Relevant Plan Provisions

The provisions of an ERISA-regulated employee benefit plan must be interpreted under principles of federal common law. See Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56 (1987); see also Nash v. Trustees of Boston Univ., 946 F.2d 960, 964 (1st Cir. 1991) (applying that tenet to a severance pay plan). We think it obvious that federal common law embodies commonsense principles of contract interpretation. Thus, straightforward language in an ERISA-regulated plan should be accorded its plain, ordinary, and natural meaning. Burnham v. Guardian Life Ins. Co., 873 F.2d 486, 489 (1st Cir. 1989). It is against this backdrop that we inquire into the contours of the phrase "change in control."

The Plan itself contains the operative definition. It enumerates five events that will suffice to trigger a change in

control.  Two of these are potentially relevant here (Events 2 and 5).  Event 2 provides that a change in control shall be deemed to have occurred upon the emergence of "an Acquiring Person (as such term is defined in the Rights Agreement dated as of May 9, 1991 between [BTI] and The First National Bank of Boston)."  Event 5 provides that a change in control shall be deemed to have occurred if "the Company shall sell all or substantially all of its assets to another person or entity in one transaction or a series of related transactions."  The plaintiff argues that one or both of these events occurred prior to the date of his discharge (October 24, 1997).  We think not.

## B.

## Event 2

The plaintiff's argument that CTI became an "Acquiring Person" immediately upon the signing of the agreement to merge is insupportable.  The Plan borrows the definition of acquiring person used in the Rights Agreement between BTI and its principal lender, originally entered into on May 9, 1991.  That pact defines an acquiring person as "any person who . . . shall be the Beneficial Owner of 20% or more of the shares of Common Stock then outstanding of [BTI]."  In turn, it defines beneficial owner as any person who owns or "has the right to

-7-

acquire" securities.[2] The plaintiff asserts that, upon executing the agreement to merge, CTI "ha[d] the right to acquire" BTI's stock (and, thus, became an acquiring person at that moment).

The flaw in this argument is that CTI did not obtain an unconditional right to acquire BTI's stock merely by signing the agreement to merge. There were numerous conditions precedent to the merger,[3] and a failure of any of these conditions would have scuttled the merger. Consequently, CTI did not have "the right to acquire" BTI's stock until these

---

[2]The parties to the Rights Agreement amended these definitions on August 20, 1997, to facilitate the proposed merger. The defendants urge us to apply the new language (which plainly excludes any possibility that CTI might have become an acquiring person merely by agreeing to merge). The plaintiff notes that the Plan itself was never amended and contends that the language in effect when he first became a participant should apply. We assume, for argument's sake, that the plaintiff is correct.

The plaintiff also contends that the mere fact that CTI's counsel saw fit to request amendment of this language buttresses his construction of the operative terms. But lawyers frequently see ghosts under every bed, and the fact that a party seeks a protective amendment does not necessarily mean that the unamended language is antithetic to his cause.

[3]Article VI of the agreement to merge sets forth an array of conditions precedent that had to be satisfied or waived in order for the merger to go forward. These include (1) stockholder approvals, (2) termination or expiration of the waiting period under the Hart Scott Rodino Act, 15 U.S.C. §§ 1311-1314 (1994 & Supp. V 1999), (3) effectiveness of the Form S-4 under the Securities Act, see 17 C.F.R. § 230, (4) Nasdaq listing of CTI's common stock, and (5) the receipt of opinion letters vouchsafing that the merger would qualify as a "pooling of interests" transaction.

conditions were satisfied and the merger was consummated.  See,
e.g., Riseman v. Orion Research, Inc., 749 F.2d 915, 919 (1st
Cir. 1984) (explaining that a "firm agreement" is not tantamount
to a purchase until the performance of a condition precedent).
The last of these conditions precedent was not fulfilled until
January 14, 1998 (the day that the parties consummated the
merger).  Because CTI did not become an acquiring person until
that day, no change in control within the purview of Event 2
occurred during the currency of the plaintiff's employment.

## C.

### Event 5

That leaves Event 5:  the "asset sale" provision.  The
evidence establishes beyond hope of contradiction that the
CTI/BTI merger was a stock-for-stock transaction that did not
involve the sale simpliciter of BTI's assets.  To be sure, CTI
adumbrated in an August 1997 press release that BTI's operations
would be combined post-merger with those of CTI's network
systems division.  Then, after the merger had been consummated,
CTI transferred certain of its assets, which included the former
assets of BTI, to CNSI (a newly-created subsidiary that assumed,
inter alia, the functions of CTI's network systems division).
Moreover, CTI appears to have effectuated the transfer by bill
of sale.  This latter transaction, the plaintiff asseverates,

-9-

was tantamount to a sale of BTI's assets, triggering a change in control because it was one of "a series of related transactions." This asseveration is unpersuasive.

In the first place, there was no "sale." Moreover, assuming arguendo that a sale occurred, it was not a sale by BTI, but, rather, a sale by CTI of BTI's <u>former</u> assets. Indeed, after the parties consummated the merger on January 14, 1998, BTI ceased to exist (and, therefore, neither had assets to sell nor the capacity to sell them).

In the second place, the only thing that actually transpired before the plaintiff's dismissal was the execution of the agreement to merge — and that agreement did not <u>require</u> a transfer of BTI's assets by sale or otherwise. The reference in the text of Event 5 to a "series of related transactions" does not repair this hole in the plaintiff's case. Settled principles of construction forbid the balkanization of contractual language for interpretive purposes. <u>See</u> <u>Smart</u> v. <u>Gillette Co. Long-Term Disab. Plan</u>, 70 F.3d 173, 179 (1st Cir. 1995). Here, the plaintiff's construction wrests the phrase "series of related transactions" from its contextual moorings. When that phrase is read — as it must be — as part of the description of Event 5 as a whole, it plainly means that, for a triggering event to occur, BTI must "sell all or substantially

-10-

all of its assets" either "in one transaction or a series of related transactions."  Where, as here, BTI never essayed a sale of its assets, and none was required by any agreement entered into prior to the date of the plaintiff's dismissal, there was no series of related transactions within the ambit of Event 5. The plaintiff cites no authority that would give the quoted language so broad a sweep, and we see no basis for interpreting it in so expansive a manner.

In a last-ditch effort to salvage his Event 5 argument, the plaintiff remarks that the district court granted summary judgment as to Event 5 in its initial (March 1, 1999) order — prior to the Wnorowski deposition.  Building on this foundation, the plaintiff complains in a desultory fashion about the timing. We see no prejudice (and, therefore, no basis for any complaint).  The dispositive question is purely a matter of interpreting unambiguous contract language.  Extrinsic evidence is generally inadmissible on such a question, see Smart, 70 F.3d at 178; Boston Edison Co. v. FERC, 856 F2d 361, 367 (1st Cir. 1988), and the plaintiff has not indicated how access to discovery might have put him in a more advantageous position.

**D.**

**Opportunity for Discovery**

-11-

The final point raised on appeal concerns whether or not the district court permitted the plaintiff an adequate opportunity for discovery. The facts are as follows. On February 1, 1999, the plaintiff filed both an opposition to the defendants' motion for summary judgment and a Rule 56(f) motion seeking additional discovery. In an affidavit accompanying the later motion, counsel for the plaintiff complained generally that he had been afforded an insufficient opportunity for discovery, but he did not set forth what discovery he desired (save for a Rule 30(b)(6) deposition).[4] At the ensuing hearing on the defendants' summary judgment motion, counsel explained that the additional discovery would permit him to test the veracity of the statements contained in the Wnorowski affidavit.

On March 1, 1999, the district court granted the plaintiff's request for additional discovery, allowing him to depose a representative of the defendants for up to three hours. The plaintiff proceeded to depose the defendants' designated

_____

[4]When a corporation is deposed, the corporation, in response to a deposition notice, is obliged to "designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf . . . ." Fed. R. Civ. P. 30(b)(6). Under this protocol, "[t]he person[] so designated shall testify as to [all] matters known or reasonably available to the organization." Id. In this case, the plaintiff asked for leave to invoke this rule and tendered a draft of a subpoena duces tecum that he proposed to serve in connection with such a deposition.

representative, Wnorowski, for approximately ninety minutes.  He then renewed his request for further discovery, but was inexplicit about what additional discovery he wished to pursue or why he wanted to pursue it.  The district court denied the renewed request.

We need not tarry.  The management of pretrial discovery lies primarily within the sound discretion of the district court.  See Faigin v. Kelly, 184 F.3d 67, 84 (1st Cir. 1999).  This court "will intervene in such matters only upon a clear showing of manifest injustice, that is, where the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party."  Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 186 (1st Cir. 1989).  This is a high hurdle, and the plaintiff cannot clear it here.

Among other things, a party who seeks to invoke the prophylaxis of Rule 56(f) must articulate some plausible basis to support a belief that discoverable material exists which, if available, would suffice to raise a trialworthy issue. Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 988 (1st Cir. 1988).  At the time that the plaintiff renewed his discovery request, he already had copies of his own employment agreement, the agreement to merge, the Rights Agreement, the amendment to the Rights Agreement, the Plan, the

press release announcing the execution of the agreement to merge, and the pertinent minutes of BTI's board of directors. He also had the benefit of the Rule 30(b)(6) deposition. Apart from these items the plaintiff has not identified a single piece of discovery that would assist him in prosecuting his claims.

That omission is not surprising. The resolution of this paper-intensive case is dependent on the documents, and the documents are unambiguous insofar as they pertain to the issues presented. It is surpassingly difficult to imagine what additional evidence might bear on the issues that the plaintiff presses or what other testimony he might need to respond to the defendants' motion for summary judgment. Because the plaintiff cannot demonstrate that the trial court's management of the discovery process was unfairly prejudicial, his Rule 56(f) claim cannot succeed.

At the risk of carting coal to Newcastle, we mention a further ground that supports this holding. After taking the Rule 30(b)(6) deposition, the plaintiff filed a cross-motion for summary judgment along with his motion to reopen discovery. The filing of the former motion constituted an acknowledgment by the plaintiff that he had sufficient knowledge of the situation, then and there, to justify asking the court to enter summary judgment in his favor. As we have said before, the making of

such a motion almost invariably indicates that the moving party was not prejudiced by a lack of discovery. See, e.g., Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 23 (1st Cir. 1999) ("Ordinarily, a party may not attempt to meet a summary judgment challenge head-on but fall back on Rule 56(f) if its first effort is unsuccessful.") (citation and internal quotation marks omitted); C.B. Trucking, Inc. v. Waste Mgmt., Inc., 137 F.3d 41, 44 (1st Cir. 1998) (similar); Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 92 (1st Cir. 1996) (similar).

### IV.

### Conclusion

We need go no further. When the words of a severance pay plan are plain, we will refrain from attempting to tease out of the text far-fetched nuances of meaning. Cf. Taylor v. Aetna Cas. & Sur. Co., 867 F.2d 705, 706 (1st Cir. 1989) (per curiam) (admonishing that courts should "abjure unnecessary mental gymnastics which give the terms of [a document] a forced or distorted construction") (citation and internal quotation marks omitted). That rule applies here — and the fact that the severance pay plan is regulated under ERISA does not diminish its cogency. In the last analysis, courts have no warrant to redraft employee benefit plans in an effort either to work rough

-15-

justice or to palliate the seemingly harsh effects of considered language in particular cases.  Giving the relevant provisions of the Plan their plain, ordinary, and natural meaning, the district court's summary judgment order is fully supportable.

**Affirmed**.