# United States Court of Appeals
## For the First Circuit

No. 22-1614

BARBARA M. PARMENTER,
individually and on behalf of all others similarly situated,

Plaintiff, Appellant,

v.

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA; TUFTS UNIVERSITY,

Defendants, Appellees,

DOES 1-50,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Montecalvo and Thompson, Circuit Judges,
and Carreño-Coll,* District Judge.

Jonathan M. Feigenbaum for appellant.

Amanda S. Amert, with whom Erica C. Spilde, Wilkie Farr &
Gallagher LLP, Jonathan I. Handler, and Day Pitney LLP were on
brief, for appellee The Prudential Insurance Company of America.

Douglas E. Motzenbecker, with whom Thomas Blatchley and
Gordon & Rees LLP were on brief, for appellee Tufts University.

_____

* Of the District of Puerto Rico, sitting by designation.

February 14, 2024

THOMPSON, **Circuit Judge**.  Long-term care insurance covers the costs of care when policy holders need assistance with the activities of daily living.  This insurance is often available for purchase through a program offered by an employer, with the coverage generally stepping in when neither Medicare nor private health insurance provide coverage.  Plaintiff (now appellant) Barbara Parmenter ("Parmenter") subscribed to such a policy offered by her employer Tufts University ("Tufts") and underwritten by The Prudential Insurance Company of America ("Prudential").  The policy is governed by the Employee Retirement Income Security Act of 1974 ("ERISA").  After Prudential twice increased Parmenter's premium rate payments for her policy, she sued Tufts and Prudential, alleging each breached their respective fiduciary duties owed to her when Prudential increased those rates.  The defendants responded with motions to dismiss for failure to state a plausible claim.  Siding with the defendants, the district court granted each of their motions and Parmenter now appeals the judgment dismissing her case.  For the reasons we explain below, we reverse in part and affirm in part.

## BACKGROUND[1]

Parmenter alleges that, while employed by Tufts, she attended a presentation by Prudential where the company allegedly

---

[1] This background summary relies on the allegations in the operative complaint (which is Parmenter's First Amended

- 3 -

"assured prospective enrollees that any future premium increases would need to be approved by the Massachusetts Commissioner of Insurance before the increase could become effective." The "Tufts University Group Contract . . . Prudential Long Term Care Coverage" contract covering the policy in which Parmenter enrolled sometime after attending the presentation included the same promise; the Foreword states that Prudential "may increase the premiums you pay subject to the approval of the Massachusetts Commissioner of Insurance." The contract also has a discrete section for "Premiums" wherein the "Increases in Premiums" subsection says simply that Prudential "reserves the right to change premium rates" (without reference to approval by any other body). And in the "Additional Coverage Features" section of the contract, without referencing the need for prior approval, Prudential includes a "Substantial Premium Increase Table" purporting to show the amount it may increase premiums based on an insured's age.

Parmenter says she paid the premiums "for years" and then, in both 2019 and 2020, Prudential raised the premiums (by 40% and 19%, respectively) without securing the approval of the

Complaint), accepting the facts provided therein as true, as well as on the insurance policy documents (specifically the group contract and Summary Plan Description) Parmenter attached to her complaint. See Sonoiki v. Harv. Univ., 37 F.4th 691, 697 (1st Cir. 2022).

- 4 -

Massachusetts Commissioner of Insurance.[2]  After the second unapproved premium rate increase, Parmenter stopped making the premium payments (an option allowed under the contract but with the consequence of receiving a reduced maximum benefit under the plan).

Parmenter initiated this lawsuit against Prudential and Tufts in January 2022.[3]  She asserted Prudential breached its fiduciary duty to her when it raised the premium rate payments without first securing the approval of the Massachusetts Commissioner of Insurance as promised both in the contract and at the presentation she had attended prior to enrolling, and that Tufts breached its fiduciary duty by "failing to monitor Prudential."  Relying on ERISA, Parmenter sought equitable remedies pursuant to 29 U.S.C. § 1132(a)(3); namely, reformation and disgorgement of the increased premiums received available to her (captioned as count 1).  In addition, Parmenter sought (pursuant to 29 U.S.C. § 1132(a)(1)(B)) to enjoin Prudential from raising the premiums again without obtaining approval (captioned

---

[2] Parmenter's pleading reveals no other details about herself, her position at Tufts, when she attended Prudential's presentation, or when she initially enrolled in the policy.

[3] Parmenter initiated the suit on her own behalf as well as on behalf of all others similarly situated, and she included allegations for future certification as a class action.  The class allegations were not addressed during the adjudication of the motions to dismiss below and are not a subject in this appeal.

as count 2).  Lastly, Parmenter alleged entitlement to recover her costs of the litigation, including attorney's fees, pursuant to 29 U.S.C. § 1132(g)(1) (captioned as count 3).

The district court concluded Parmenter had not plausibly stated a claim for breach of fiduciary duty because the Massachusetts Commissioner of Insurance had not yet "exert[ed] its regulatory authority over premiums for group employer coverage," interpreting that part of the group contract stating that increases to premiums would be "subject to" the approval of the Commissioner as only effective if and when the Commissioner "opts to require such approval."  Without any plausibly alleged claims establishing potential wrongdoing by either defendant, the district court entered judgment in the defendants' favor.[4]  Now Parmenter turns to us, arguing the district court effectively rewrote the plain language in the group contract about premium increases, turning what she calls a condition precedent (no increase unless or until the Massachusetts Commissioner of Insurance approves the proposed

_____

[4]  The district court also concluded that Parmenter's allegations of Prudential's "material misrepresentation" at the presentation Parmenter attended -- about seeking the Commissioner of Insurance's approval prior to putting premium increases into effect -- failed to meet the heightened pleading strictures for fraud-related claims set forth in Rule 9(b) of the Federal Rules of Civil Procedure because the complaint did not "specify the time and place of the alleged misrepresentation."  In Parmenter's briefing to us, she is crystal clear that she is not alleging or claiming fraud, so we will not examine her allegations in the context of Rule 9(b).

increase) into an optional step (premium rate increases are "subject to" review and approval by the Massachusetts Commissioner of Insurance only when the Commissioner chooses to begin exercising its authority to review proposed premium increases).

## DISCUSSION

We review anew a district court's decision to dismiss a complaint for failure to state a plausible claim. N.R. by & through S.R. v. Raytheon Co., 24 F.4th 740, 746 (1st Cir. 2022) (citing Ezra Charitable Tr. v. Tyco Int'l, Ltd., 466 F.3d 1, 5 (1st Cir. 2006)). Our work involves "assum[ing] all well-pleaded facts [are] true, analyz[ing] those facts in the kindest light to the plaintiff's case, and draw[ing] all reasonable inferences in favor of the plaintiff." Id. (citing U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011)). Then we decide whether the plaintiff has pled "factual allegations, either direct or inferential, [about] each material element necessary to sustain recovery under some actionable legal theory." Id. (quoting Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008)). "We may augment these facts and inferences with data points gleaned from documents incorporated by reference into the complaint." Id. (quoting Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011)).

A claim for breach of a fiduciary duty under ERISA includes proving a breach, a loss, and the causal connection

- 7 -

between the two. See Brotherston v. Putnam Invs., LLC, 907 F.3d 17, 30 (1st Cir. 2018); 29 U.S.C. § 1109. Parmenter seeks relief pursuant to ERISA's civil enforcement provision, which allows participants in ERISA welfare plans to bring a civil action "to recover benefits due . . . under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan," 29 U.S.C. § 1132(a)(1)(B), or "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or . . . to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan," id. § 1132(a)(3).

We will examine Parmenter's alleged breach-of-fiduciary-duty claims against each defendant separately, taking our lead from the parties' briefing on where to focus, which homes us in on whether each owed Parmenter the fiduciary duty she has alleged and whether she has plausibly pled a breach of their respective duties.

## **Prudential**

### Duty

Parmenter alleges that Prudential's fiduciary status derives from its role managing the long-term care insurance policy, as expressed in the terms of the group contract and in the Summary Plan Description, specifically the authority and discretion (subject -- in some way -- to the approval of the Commissioner of

- 8 -

Insurance) that it enjoys over setting the premium rates. In Prudential's motion to dismiss, it argued to the district court that it was not a fiduciary with respect to setting the premium rate, but the district court did not address this point in its decision granting the motion. The parties bring this point up again on appeal. Whether Parmenter plausibly alleged Prudential owed her a fiduciary duty under ERISA with respect to premium rates is a threshold issue before us because there can be no breach of a particular duty if a party does not owe that duty to the plaintiff in the first place. We briefly explain why Prudential loses on this point.

Consistent with the allegations in her complaint, Parmenter again points to Prudential's representations in the terms of the group contract and in the Summary Plan Description, arguing before us that Prudential represented itself as a fiduciary and that it acted as a fiduciary when it made the discretionary decision to raise the premium rate for the plan's participants. As the Summary Plan Description clearly states, Prudential tells plan participants that it serves as a fiduciary and that it owes them a duty to operate the plan in a prudent manner: "ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called 'fiduciaries' of the plan, have a duty to do so prudently and in the interest of you and other plan participants

- 9 -

and beneficiaries." As Parmenter also points out, ERISA is clear that the "[p]rudent man standard of care" includes "discharg[ing] . . . duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . in accordance with the documents and instruments governing the plan . . . ." 29 U.S.C. § 1104(a)(1)(D); see Raytheon Co., 24 F.4th at 749 (relying on this statutory provision).

As relevant here, ERISA also defines an individual fiduciary as follows: "[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A); see Shields v. United of Omaha Life Ins. Co., 50 F.4th 236, 252 (1st Cir. 2022) ("The Supreme Court of the United States has explained that the 'primary function' of a fiduciary duty under ERISA 'is to constrain the exercise of discretionary powers which are controlled by no other specific duty.'" (quoting Varity Corp. v. Howe, 516 U.S. 489, 504 (1996))). As this court has said before, "[d]iscretionary acts trigger fiduciary duties under ERISA only when and to the extent that they relate to plan management or plan assets." Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 60 (1st Cir. 2014). According to Prudential (which cites only out-of-circuit nonbinding cases to support its

- 10 -

point), we should view its act of raising the premium rate not as plan management, but rather, as a business decision, which Prudential says falls outside the scope of its status as a fiduciary. The cases on which Prudential relies, however, to demonstrate business decisions deemed to fall outside the scope of fiduciary duties are readily distinguishable. For example, those cases involved pension plans and claims against employers for either decisions involving how to staff financial projects and transactions, a non-defendant trustee's decision regarding transferring plan assets, Hunter v. Caliber Sys., Inc., 220 F.3d 702, 718-19 (6th Cir. 2000), or the sole discretionary decision being whether the employer contributed stocks instead of cash to the 401(k) plans, Coulter v. Morgan Stanley & Co., Inc., 753 F.3d 361, 367 (2d Cir. 2014). Neither case speaks directly to Parmenter's situation in which she is a plan participant in a welfare benefit plan operated and provided by a party who is not her employer.

In our view, Prudential's decision to exercise its discretion and increase premiums is part of the overall management of the welfare benefit plan. In the plan documents, Prudential held itself out to the plan participants as owing them a fiduciary duty of prudence. Pursuant to ERISA, at the very least Prudential owed Parmenter a fiduciary duty of prudence to manage the plan in accordance with the documents governing the plan, i.e., as per the

- 11 -

requirements of the "Tufts University Group Contract . . . Prudential Long Term Care Coverage" contract, however it is ultimately interpreted. See 29 U.S.C. § 1104(a)(1)(D).

We now move on to consider the plausibility of the breach allegations against Prudential.

Breach

Parmenter alleges and argues that Prudential breached its fiduciary duty when it increased the premiums without first securing the approval of the Commissioner of Insurance as promised in the group contract. Prudential counters that the "subject to" language is simply a nod to the Commissioner of Insurance's authority to regulate; a placeholder for the time when the Commissioner does promulgate regulations and a process for review and approval of premium rates, and that the language at issue does not lock the premiums until the Commissioner begins regulating employer-sponsored group insurance policies. Before resolving this issue, it will be helpful to explain the Commissioner of Insurance's authority to regulate this particular type of insurance as well as the basic contract principles -- both general and specific to the ERISA context -- on which our examination relies.

The Massachusetts Commissioner of Insurance (who heads up the state's Division of Insurance) has had the authority to regulate group long-term care insurance since 2013, including

- 12 -

premium rate increases. Mass. Gen. Laws ch. 176U, § 7 (2013). However, despite being granted statutory authority a decade ago, the regulations for long-term care insurance expressly state that they do "not apply to an employment-based group policy." 211 Mass. Code Regs. § 65.02; see also *Long-Term Care Insurance Rate Increase Questions and Answers*, Mass. Div. of Ins., https://www.mass.gov/service-details/long-term-care-insurance-rate-increase-questions-and-answers [https://perma.cc/2GCL-DNBL] ("The Division of Insurance does not approve rate changes for employer group plans or policies offered through associations.").

Turning to ERISA, it is long-settled that "provisions of an ERISA-regulated employee benefit plan must be interpreted under principles of federal common law." Ministeri v. Reliance Standard Life Ins. Co., 42 F.4th 14, 22 (1st Cir. 2022) (quoting Filiatrault v. Comverse Tech., Inc., 275 F.3d 131, 135 (1st Cir. 2001)). By that, we mean that ERISA does not include a "body of contract principles informing the interpretation and enforcement of employee benefit plans." Nash v. Trs. of Bos. Univ., 946 F.2d 960, 964 (1st Cir. 1991). Rather, as we have observed, "Congress intended instead 'that a federal common law of rights and obligations under ERISA-regulated plans would develop.'" Id. (quoting Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56 (1987)). This court has commented before that "Congress specifically contemplated that federal courts, in the interests of justice,

- 13 -

would engage in interstitial lawmaking in ERISA cases in much the same way as the courts fashioned a federal common law [interpreting other federal statutes]." Id. at 965 (emphases removed) (quoting Kwatcher v. Mass. Serv. Emps. Pension Fund, 879 F.2d 957, 966 (1st Cir. 1989), abrogated on other grounds by Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon, 541 U.S. 1 (2004)). When state law is "compatible with the purpose of [the federal statute at issue], [state law] may be resorted to in order to find the rule that will best effectuate the federal policy." Id. (quoting Textile Workers Union v. Lincoln Mills of Ala., 353 U.S. 448, 457 (1957)). Indeed, "in developing the federal common law, it is not inappropriate that we examine the various state law approaches, states generally having had much more experience in the area of insurance contract interpretation." Wickman v. Nw. Nat'l Ins. Co., 908 F.2d 1077, 1084 (1st Cir. 1990).

With respect to contracts governing employee benefits plans, the federal common law "'embodies commonsense principles of contract interpretation' such as giving effect to the language's 'plain, ordinary, and natural meaning,'" Ministeri, 42 F.4th at 22 (quoting Filiatrault, 275 F.3d at 135), and has pointed to state law as the "richest source" of commonsense canons of contract interpretation, Hughes v. Bos. Mut. Life Ins. Co., 26 F.3d 264, 268 (1st Cir. 1994) (quoting Rodriguez-Abreu v. Chase Manhattan

- 14 -

Bank, N.A., 986 F.2d 580, 585 (1st Cir. 1993)).[5]  In addition, part of determining a "common understanding" of a term may include reference to dictionaries, though those definitions need not be controlling.  Ministeri, 42 F.4th at 22 (quoting Martinez v. Sun Life Assurance Co. of Can., 948 F.3d 62, 69 (1st Cir. 2020)).

Sometimes our journey into the meaning of a term reveals that the specific word or phrase at issue is ambiguous.  Id.  That is, the term in question is either "inconsistent on [its] face" or is reasonably susceptible of different interpretations, id. at 23 (quoting Martinez, 948 F.3d at 69), emphasis on "*reasonableness [as] central to [the] ambiguity analysis,*" Martinez, 948 F.3d at 69 (emphasis added).  "[W]hether a contract term is ambiguous is [a question] of law for the judge," Allen v. Adage, Inc., 967 F.2d 695, 698 (1st Cir. 1992); the determination of which includes consideration of the entire contract, Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995).  See also Amyndas Pharms., S.A. v. Zealand Pharma A/S, 48 F.4th 18, 31 (1st Cir. 2022) ("[A]n inquiring court must avoid tunnel vision: instead of focusing myopically on individual words, it must consider contractual provisions within the context of the contract as a whole."); Barclays Bank PLC v. Poynter, 710 F.3d 16, 21 (1st

---

[5] The parties do not contend that the policy contains a clear choice of law provision that might assist us here in our analysis. Therefore, we rely on general federal common law principles of contract interpretation in conducting our analysis.

Cir. 2013) ("We take the words within the context of the contract as a whole, rather than in isolation."); Restatement (Second) of Conts. § 202 (Am. Law Inst. 1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.").

The only point on which the parties here agree is that the meaning of the language at issue is plain and unambiguous, yet the plaintiff and the defendants ascribe starkly different meanings to the supposedly unambiguous contract language. According to Parmenter, "subject to" means Prudential "can raise rates" but the company promised it won't "until a regulatory framework is adopted in Massachusetts" so it can get the approval of the Commissioner of Insurance. As she frames it, "Prudential simply must wait until updated regulations are adopted by the Commissioner and approval is received before increasing premiums." According to Prudential, "subject to" is "an acknowledgement of the possibility that the Commissioner may, at some future point in time, institute an approval process for group long term care policy premiums, . . . qualifying language ensur[ing] that Prudential will seek Commissioner approval before increasing rates should the Commissioner institute a process for pre-approval in the future."

Which interpretation is correct turns on the meaning of "subject to." Black's Law Dictionary indicates that "subject to" is not a legal term with one set meaning. The term appears

frequently with other legal terms, such as "liability" ("subject to liability" defined as "susceptible to a lawsuit that would result in an adverse judgment,") or to real property concepts such as "fee simple subject to a power of termination" or "fee simple subject to special interest." Black's Law Dictionary (11th ed. 2019). The general definition of the term, according to the Merriam-Webster dictionary, is "affected by or possibly affected by (something)" or "dependent on something else to happen or be true." *Subject to*, Merriam-Webster, https://www.merriam-webster.com/dictionary/subject%20to [https://perma.cc/3P5W-7T76]. According to these general definitions, "subject to" can indicate either an absolute or a possibility, which renders both Parmenter's and Prudential's interpretations plausible and reasonable.

But we don't stop there because we must examine the "subject to" clause in the context of the rest of the policy. See Smart, 70 F.3d at 179. Doing so, however, does not clarify the meaning for us. The group contract includes two other references to premium increases. In the section of the contract dedicated to "premiums" in general, we note the following sentence: "Prudential also reserves the right to change premium rates." And the section covering "Additional Coverage Features" includes a definition of a "substantial premium increase" and a discussion of how such would be calculated based on the age of the insured. Neither section mentions the Commissioner of Insurance and the silence renders the

statements in these sections, especially the reservation of rights to increase premiums, as conflicting with the message at the very beginning of the group contract about any premium increases being "subject to" the approval of the Commissioner of Insurance. The reservation of rights clause -- on its own and in isolation from the rest of the contract -- is crystal clear, but we cannot ignore the reference to approval by the Commissioner of Insurance in the earlier part of the contract. See id. Simply put, consideration of the policy as a whole does not ineluctably lead us to a clear understanding of what the contract's "subject to" clause means. All of these considerations cause us to conclude that "subject to" is "reasonably susceptible of" different interpretations. Ministeri, 42 F.4th at 25. We therefore disagree with the parties that the language is unambiguous; it actually fits the definition of ambiguity quite comfortably. See id.

Before proceeding with our analysis, we pause to note that the court has previously commented that it "may ponder extrinsic evidence to determine whether an apparently clear term is actually uncertain," Smart, 70 F.3d at 179, or to assist with "choos[ing] one plausible interpretation over the other as a matter of law," Hughes, 26 F.3d at 269-70. To be sure, the court has warned that "this exception is narrow at best . . . extrinsic evidence will be considered for the purpose of whether an ambiguity exists only if it suggests a meaning to which the challenged

- 18 -

language is reasonably susceptible." Smart, 70 F.3d at 180. Here, the parties do not contend the contract provision at issue is ambiguous and so do not point to any extrinsic evidence to resolve an ambiguity as a matter of law. Cf. Hughes, 26 F.3d at 267, 269-70 (deciding an appeal from a motion for summary judgment and commenting both parties provided plausible interpretations of the provision at issue but the record included no extrinsic evidence to assist the court with choosing one interpretation over the other as a matter of law); Smart, 70 F.3d at 180 (deciding an appeal from a decision after an evidentiary hearing and explaining why the extrinsic evidence on which the appellant relied did not demonstrate an ambiguity in the language at issue). So we move on.

Once a court concludes a term at issue in a contract is ambiguous, the focus shifts to resolving the ambiguity which is a determination of fact to be made by a factfinder. Clukey v. Town of Camden, 797 F.3d 97, 104 (1st Cir. 2015); Hughes, 26 F.3d at 270 n.6. Federal common law also guides us here. The resolution of the ambiguity will "turn on the [contracting] parties' intent," the "explor[ation]" of which will "often (but not always) involve[] marshalling facts extrinsic to the language of the contract documents. When this need arises, these facts, together with the reasonable inferences extractable therefrom, are together superimposed on the ambiguous words to reveal the parties'

- 19 -

discerned intent." Smart, 70 F.3d at 178. This inquiry also includes the principle that "unclear 'terms must be construed in favor of' the insured" (aka "the doctrine of contra proferentem" for those who like Latin). Ministeri, 42 F.4th at 22-23 (quoting Martinez, 948 F.3d at 69) (cleaned up); Hughes, 26 F.3d at 268. This principle embodies a nod to the status of insurance companies compared to the insureds: "[I]nsurance policies are typically contracts of adhesion[;] the insurance company drafts the policy and the insured, rarely able to negotiate the terms, is left high and dry unless [they] accede[] to the proffered terms." Ministeri, 42 F.4th at 23 (citing Mut. Life Ins. Co. of N.Y. v. Hurni Packing Co., 263 U.S. 167, 174 (1923)). The insurer is not, however, left to the whim of the insured's or the court's interpretation because "[c]ourts may not indulge fanciful readings, chimerical interpretations, or 'tortured language' to find 'nuances the contracting parties neither intended nor imagined.'" Id. (quoting Burnham v. Guardian Life Ins. Co. of Am., 873 F.2d 486, 489 (1st Cir. 1989)) (cleaned up). In addition, "despite any interpretive presumption favoring the insured, an insurer may seek to overcome that presumption with probative evidence." Hughes, 26 F.3d at 270 n.6. When confronted with ambiguous ERISA policy language in the context of a motion for summary judgment we have been clear that, ultimately, "[t]he trier of fact must resolve any ambiguities in an ERISA contract identified by the court and incapable of

definitive resolution on the existing record." Id. (holding contract language at issue was ambiguous and adopting, pursuant to the doctrine of contra proferentem, the interpretation of the ambiguous language put forward by the insured) (citing Allen, 967 F.2d at 698). When the court has only pleadings before it, it has declined to resolve ambiguous contract language on review of a granted motion to dismiss. See Sonoiki v. Harv. Univ., 37 F.4th 691, 711 (1st Cir. 2022); Lass v. Bank of Am., N.A., 695 F.3d 129, 135, 137 (1st Cir. 2012). With all of these principles and precedents in mind and for the reasons we briefly explain below, the ambiguity presented here cannot be resolved with the pleading and contract documents before us.

In terms of plan management, Prudential may not have intended to promise that it would lock the premium rate until such time that the Commissioner of Insurance instituted a process to review and approve proposed premium increases. Discerning Prudential's intent is not possible, however, without knowing, inter alia, when the terms of the group contract were first drafted, whether the terms existed prior to 2013 and, if so, whether the contract was subsequently amended after the Massachusetts Legislature passed chapter 176U, § 7 to allow for a Commissioner-imposed approval process. In addition, we would need to know when Parmenter first joined the policy and therefore agreed to the terms of the insurance policy applicable to her. As

- 21 -

Prudential argues, these are details that Parmenter has not included in her allegations, but because of the ambiguous "subject to" clause in the contract, these missing details are not fatal to the plausibility of her allegations (for which she receives the benefit of our assumption that they are true, see Raytheon Co., 24 F.4th at 746). While the date Parmenter enrolled in the policy is information to which she would have had access prior to filing her complaint, the timing for the initial drafting of the group contract and amendments (if any) is not likely to have been readily available to her without the benefit of the discovery process. This information will be relevant to resolving the ambiguity once extrinsic evidence has been gathered through the discovery process. As we mentioned above, while the decision about whether a term is ambiguous is a question of law, the issue of the parties' intent goes to a factfinder when the extrinsic evidence indicates a factual dispute is at play. Balestracci v. NSTAR Elec. & Gas Corp., 449 F.3d 224, 230-31 (1st Cir. 2006).

Parmenter contends that Prudential knew "from the outset that the Commissioner lacked authority to regulate in this area at time of enrollment." She alleges in the complaint that, in a written submission to the Massachusetts Commissioner of Insurance, Prudential stated that it "did not have significant experience with group rate changes" when Tufts enrolled with Prudential and so the presentation referred to "the typical role a state plays in

the regulation of the product and rate," resulting in "general guidance" that "was not tailored" to "Group Long Term Care coverage to be issued in Massachusetts." The allegation does not include the date or context for the alleged communication with the Commissioner of Insurance, but the phrases quoted above are supposedly direct quotes from the letter. Parmenter also alleges she attended a presentation by Prudential prior to enrolling in the policy, in which Prudential "assured prospective enrollees that any future premium increases would need to be approved by the Massachusetts Commissioner of Insurance before the increase could become effective." These allegations, taken as true without the contextual details, do not help resolve the ambiguity before us; each simply underscores the need for more information about how and when the group contract was written because this will in turn inform what Prudential knew about the status of rate regulation for long term care plans in Massachusetts at the time it presented to Parmenter and when Parmenter enrolled, and therefore the intended effect of the "subject to" language.[6] In our view, these

---

[6] Parmenter also asserts several times in her brief (though we note without legal support) that "prior approval by the Commissioner" is a "condition precedent." As Prudential points out, the group contract does not identify the "subject to" language as a condition precedent. "A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Restatement (Second) of Conts. § 224 (Am. Law Inst. 1981) (adding in the Reporter's Note that conditions precedent are now simply referred to as "conditions" and the word refers to the event and not the

allegations, in light of our inability to definitively determine the intended meaning of the "subject to" clause, push Parmenter across the plausibility threshold on her claim for fiduciary breach.

Also in the mix (though neither party brings this up) is whether, if the interpretation principles set out above lead to Parmenter's reasonable interpretation of the "subject to" language ultimately winning the day, Prudential's performance may have been excused because compliance with the term was rendered impracticable by the Commissioner's explicit decision not to regulate employer-sponsored long-term care insurance plans with no indication of whether or when that may change. Impracticability applies when, "after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made . . . ." Restatement (Second) of Conts. § 261

term of the contract). When a condition is made by agreement of the parties, see id. § 226, "[n]o particular form of language is necessary . . . although such words as 'on condition that,' 'provided that' and 'if' are often used for this purpose," id. § 226 cmt. a. The phrase "subject to" is noticeably absent from this short list of examples. Moreover, "[a]n intention to make a duty conditional may be manifested by the general nature of an agreement, as well as by specific language. Whether the parties have, by their agreement, made an event a condition is determined by the process of interpretation." Id. In addition to the other reasons we have explained, the acquisition of the facts necessary to determine the parties' intent will also inform whether "subject to" was meant to represent a condition to Prudential's obligations, if any, prior to initiating an increase to the premiums.

(Am. Law Inst. 1981).  Whether impracticability would ultimately affect either party's performance, however, cannot be determined on this record.

Bottom line, there is no dispute that Prudential did not seek the approval of the Commissioner before raising Parmenter's premiums in 2019 and 2020.  Because we cannot resolve the meaning of the "subject to" clause on the current record, we reverse the judgment as to Prudential and remand for further proceedings.[7]

## Tufts

Parmenter's allegations in her complaint focus primarily on Prudential.  As to Tufts, she alleges that the Summary Plan Description names it as "the Plan Sponsor and Plan Administrator," which she says makes Tufts a fiduciary under ERISA but does not specify the type of fiduciary duty Tufts owed to her.  The only allegation that Tufts breached a duty shows up within count 1 (requesting equitable relief in the form of reformation and disgorgement of the increased premiums Prudential received) where she alleges:  "Tufts, as a co-fiduciary, did not take actions to

_____

[7] Prudential also argues that Parmenter has not suffered a loss because she is still receiving the coverage under the policy to which she's entitled, even if limited coverage after her decision to pay the lower premium.  Parmenter responds that her loss was the additional money she paid for the twice-increased premiums before she exercised the nonforfeiture option.  If Parmenter ultimately wins on the alleged breach, then she will have suffered a loss as a result of the breach.

prevent Prudential from raising premiums and breached its fiduciary duties to the participants by failing to monitor Prudential."[8] The district court also focused almost exclusively on Prudential, providing no separate reasoning related to Tufts' motion to dismiss (though it clearly granted both defendants' motions to dismiss and entered judgment in favor of both defendants).

Before us, Parmenter continues to argue that Tufts is liable as a co-fiduciary for the allegedly unauthorized raise in premiums because it "failed to do anything to stop Prudential from breaching the Plan terms." Tufts rejoins that Parmenter has not stated a plausible claim against it because Tufts "played no role in the premium increase and derived no financial benefit from it." Responding to Parmenter's assertion that Tufts had a duty to monitor Prudential, Tufts says she has not pled any facts that would show Tufts had an obligation to monitor Prudential or keep Prudential from increasing the premiums, especially when Prudential so clearly had the discretion to increase premiums.

---

[8] Parmenter also argues that Tufts, as the named plan administrator in the Summary Plan Description, was a named fiduciary and therefore was responsible for monitoring and controlling fees and expenses paid by plan participants. According to Parmenter (and citing 29 U.S.C. § 1002(16)(A)), Tufts is directly liable even though it wasn't directly involved in setting premiums. Problem is, Parmenter's complaint does not allege Tufts breached this fiduciary duty; instead she only alleges breach as a co-fiduciary.

"Co-fiduciary liability is a shorthand rubric under which one ERISA fiduciary may be liable for the failings of another fiduciary. Co-fiduciary liability inheres if a fiduciary knowingly participates in or conceals another fiduciary's breach, enables such other to commit a breach, or learns about such a breach and fails to make reasonable efforts to remedy it." Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 18-19 (1st Cir. 1998) (citing 29 U.S.C. § 1105(a)). Parmenter's allegations with respect to Tufts -- that it failed to take any action to prevent the premium rate increases or "monitor Prudential" -- does not fall into one of the categories of co-fiduciary liability set forth in § 1105(a) because there are no allegations Tufts knowingly participated in, concealed, enabled, or failed to intercede in any way to influence Prudential's decision to increase the premium rates which affected Parmenter's premium payments. Based on the text of section 1105(a), it seemingly contemplates active steps in furtherance of the breach whereas Parmenter alleges Tufts stood by and did nothing. We therefore affirm the district court's judgment dismissing the complaint as to Tufts.

## WRAP UP

The district court's judgment is reversed in part and affirmed in part. Costs are awarded to Appellant.